Davis, J.,
delivered the opinion of the court:
An opinion has already been read in this case, in which plaintiffs’ several patented devices for improvements in military arms were discussed, and the conclusion was reached that one of these, that for extracting and ejecting the shell after firing, is found in the Springfield musket. Further proceedings were directed to be taken in accordance with a memorandum handed down with the order remanding the cause. The case is now resubmitted in accordance with the terms of the order and memorandum.
At the second hearing defendants introduced patents which were not before called to our attention, and which, it is claimed, anticipate plaintiffs’extractor ejector device. Defendants’ counsel have also again urged upon our consideration the patent of W. S. Smoot (No. 68250), which we described and discussed in our former opinion. We see no reason upon a reexamination of this last-named invention to change the opinion heretofore expressed by us in regard to it; in fact the model lately submitted tends to show more strongly that the device lacks the simplicity of the Springfield or Berdan ejector, and that it would, apparently, be more susceptible than either of them to the effects of dust and dampness, that it would be more easily injured by accident, and would require greater care and attention. All of these criticisms show defects which in an army musket are serious. As to this, however, we are without the benefit of any evidence of practical experience in the use of the ejector and our suggestions remain merely matters of opinion founded upon an examination of the patent and the model-The Smoot patent is very broad in character; the claim is for “a cartridge-extractor swinging loosely on a common center with that of the carrier or breechblock when said extractor, after being gradually operated by swinging the said block, is made to take on by any means a suddenly accelerated movement to extract the shell, without accelerating the movement of the block itself by which the extractor is operated.” The claim is very broad; it covers the whole scheme of cartridge ejection; there is in it no limitation to any specific device; on the contrary, it covers “ any means” which shall give a suddenly accelerated movement to the shell without regard to the details of the mechanism employed for that purpose.
*71 There is nothing in the Smoot invention which is in any sense a discovery and there is nothing of this nature in any of the extractors shown to us. It was admitted and is shown by the many devices before us that a suddenly accelerated motion to the shell was generally assumed to be necessary ; the principle was not new; what was sought and what was patentable was the mechanical combination which could successfully accomplish the desired result in a military arm exposed to the weather and dirt in unskillful, anxious, and busy hands. All extractor inventions have had the same aim, which is but the application of known methods to a known result; all that remained for a patent was the mechanical combination. Smoot claimed a result which inventors in firearms were then striving to obtain, to wit, the suddenly accelerated motion imparted to the shell after it had been loosened in the bore and when the way should be clear for its sharp ejection rearwards. We are not called upon for the purpose of this case to decide whether this claim is so broad as to make void the patent, or whether the claim is limited to the particular device described in the specifications, and these specifications are so broad in their description as to cover almost any possible extractor which shall at first loosen the shell and then suddenly eject it; for example, as an extractor Smoot in his specifications makes his breechblock swing—
“Both in conjunction with and also independently of the extractor, to impart a‘ suddenly accelerated movement without restricting myself to a block opening upward or downward or otherwise. As a spring ejector in addition thereto it is of the essence of my invention to impart a suddenly accelerated movement to the extractor, whether rotated on the action of the breechblock or otherwise, as may be the more eouvenient for the play of the operating spring. This spring to perform its functions may, as seen in the drawings, be made to react by passing the center of the extractor, acting endwise thereto, by link or other familiar attachment, or it may be made to pass under or over the same and react by striking into a notch, or it may be made to act otherwise, so only that by its reaction the extractor is made to take on suddenly accelerated movement.”
It is difficult to imagine a broader specification; it is intended to cover what the claimant claims, namely, any method of imparting suddenly accelerated movement to the shell. The de *72 tails of the particular method described for obtaining this result are not those found in the Springfield gun or the Berdan device, nor is the claim limited to the details described by any such words as “ substantially as described” or “ substantially as set forth.” (Burr v. Duryee, 1 Wallace, 531; Case v. Brown, 2 Wallace, 820; Seymour v. Osborn, 11 Wallace, 516; Dedrick v. Seigmund, Official Gazette, vol. 52, No. 10, p. 1537; The Corn Planter Patent, 23 Wallace, 181.)
It is not for us to decide whether the Smoot patent is or is not valid ; we have only to see whether the device anticipated Berdan’s or anticipated the device found in the Springfield arm; we are still of opinion that it did not.
Morgenstern’s patent No. 86,434 is dated February 2, 1869, but it was applied for October 22, 1868; Berdan’s application for patent No. 88,436 was filed July 31,1868, three months in advance of Morgenstern; this patent No. 86,434 may therefore be laid outside the case, and we shall consider the other patent, No. 87,190. Here is found a device much more similar to that of Berdan or the Springfield rifle than any of the many others which have been brought to our notice; it may be thus described: There is a set screw lying horizontally upon the top of the gun-barrel, just forward of the receiving chamber, its head pointing towards the muzzle of the gun; the after part of this set screw is in the form of a cone, its apex being near the ejector plate, but with a space between them; around this cone is wound a wire following the shape of the cone and so constituting a volute spring; the apex of the cone points to the center of the ejector plate, and the cone is immovable except that through the screw it may be forced forward or back in a line with the bore of the gun; it has no movement at any angle with the plane of the bore; after leaving the apex of the cone the volute spring continues in the same form a short distance when its end is straightened out and strikes the ejector plate substantially in a line with the apex of the cone. The inventor says as to this in his specifications:
“ The volute spring 6 * * presses against the extractor W in such manner, before said extractor is moved by the swinging breechblock * * as to tend to retain said extractor in the position seen in Fig. 1, but after the said extractor has been turned so far on its axis as to bring the point against which spring 6 bears below a right line passing through said axis and *73 the centre of screw J, the said spring presses upon the said extractor in such a manner as to force the extractor into the position illustrated at Fig. 2.”
It would seem from this description that when the breech-block was closed the point of the spring rested somewhat above the center of the extractor plate, and by the turning of the plate, through the opening of the breechblock, was brought slowly past the center, when, being released, it shot downward and backward. That part of the spring which projects beyond the cone is unsupported either internally by a mandrel or externally by a casing; the spring therefore lacks strength and durability; it has' a tendency under pressure to buckle or to take the form of a bow. This difficulty was apparently appreciated by the inventor, as in his succeeding patent he adopted a different device.
Morgenstern’s claim upon this branch of his patent was as follows:
u In combination with the ejector W the spiral spring 6 and set screw J, the whole arranged to operate substantially as and for the purpose set forth.”
His combination is of three parts, the ejector, spiral spring, and set screw. As we have seen, in the then state of the art, this claim is a narrow one to be strictly construed. The inventor himself emphasized the importance of the set screw in his specifications, where he said <c the object and advantage of the set screw J are to increase the effectiveness, as it (the spring) loses its elasticity, or as circumstances nlay require” and he adds that in case the spring should break it may still be made to act “ by crowding the portions together by the screw J.” As to the spring, he preferred one in a volute form, but added this : “ A plain spiral spring may be employed with its end properly straightened out to act on the ejector W.” So’ Morganstern regarded as valuable, and important to his combination, the set screw, and* he left, in any contingency, a portion of his spring in such form that it would be subject to bow or buckle under i>ressure. The arrangement of the set screw and spring are vital elements of the Morgenstern combination.
The difference between the various devices intended to produce successful extraction and ejection of the cartridge, produced in the years just succeeding the war, were most minute, *74 and to the layman who now examines them for the first time it might well seem doubtful whether, given the one unsuccessful invention, a shilled workman could not have manufactured the other sucessful invention without the exercise of any inventive genius. But the many patents issued covering such devices show a general effort to accomplish the desired result by methods substantially similar and differing only in apparently trifling details. These details, however insignificant they may have appeared at the time to one not familiar with the art, were then evidently deemed important by experts, as is shown by the many patents applied for and the many patents granted. It does not appear in this case that any practically successful extractor-ejector for a rifle of the Springfield type was produced in advance of the Berdan or Adams device. The differences between the many inventions were slight. The successful device is simple in construction and much resembles the others, as they resemble each other; but changes as slight as those found in this device, when compared with others, are found in the other devices when compared with each other,
Morgenstern, Smoot, Ball, and the rest produced interesting inventions not very unlike in mechanical construction, yet each held by the proper authority to be patentable, and none so far as we have been shown has proved to be successful in practical use. Slight changes in the detail of arrangement were important to success in a device of so fine and delicate adjustment, which must uevertheless be simple in construction and durable under exposure and rough or careless treatment. Morgan-stern’s first ejector, it seems to us, did not fulfill these conditions ; the inventor apparently realized this, for within seven months he presented a modification of it, which was patented. JT mechanical skill only was required to adapt Morgenstern’s first unsuccessful invention to the successful result achieved by Berdan and Adams, we would expect that fact shown in the description of the second device. But it is not so ; he entirely changes his spring arrangement, still leaving it with a tendency to buckle; but fails to produce a design having the distinguishing elements of the Springfield device : simplicity, certainty, and durability.
One of the subjects named in the memorandum accompanying the order remanding this cause was thus stated:
*75 “ Whether the Government is liable upon the theory of an implied contract to compensate the plaintiffs for the ejector device in use upon the Springfield gun.”
The obligation of the Government to compensate an inventor for the use of a patented invention was very fully examined in the case of McKeever (14 0.01s. B., 396), where for the first time a patentee recovered royalty upon the theory of an implied contract against the United States, directly, without resort to the theretofore customary course of an action in infringement against the individual officer who had used the invention in the discharge of his official duties..
Burn’s Case (12 Wall., 246,) sustained an express contract to pay royalty and was held in the later case of Cammeyer v. Newton (94 U. S. R,, 225), as deciding “ that the Government can not, after the patent is issued, make use of the improvement any more than a private individual without license of the inventor or making him compensation.”
It is now settled that the United States is liable, as is a citizen, to pay for the use of a patented invention. ' Such being the inventor’s right, we meet a difficulty as to his remedy. If there be an express contract between the patentee and a properly authorized agent of the Government, his remedy is clearly in this court; this would be so if the facts disclose an implied contract; but if the use be in its nature an infringement we are without jurisdiction in the matter.
In Forehands’ Case (23 C. Cls. R., 477) there appeared at the most (admitting for argument’s sake all of plaintiff’s contentions) a naked user by the Government in ignorance of any claim of right by the patentee.
The court said:
‘‘Neither plaintiffs nor Howe submitted the patent to the Government, or asked the Government to use the invention or to pay for it, and the Government by no affirmative act recognized any right in the plaintiffs or in Howe in the alleged improvement in cartridges. To establish a contract here, therefore, we must proceed to this extent, that a contract for the use of an invention upon which the inventor may rely for the recovery of royalties is to be implied whenever the Government uses an invention, whether through ignorance or carelessness or mistake. That is, such a contract arises from naked use, even, perhaps, if under a claim of right. A mistaken or *76 unauthorized use of an invention by a Government officer can not, however, create a contract.
“ And we hold that the facts in that case developed at the most a £ disturbance or infringement ’ of plaintiff’s rights, ‘ not a caption of his property.’ ”
In the case of Schillinger (24 C. Cls. R., 278) we held that there had been an actual denial of plaintiff’ rights in the invention used, and, after citing the cases heretofore decided in the Supreme Court and in this court, which seemed to bear upon the question at issue, we said:
“ A careful examination of these cases shows that a contract to convey is implied whenever the Government, acting through a competent agent, takes or uses individual property, acknowledging explicitly or tacitly that the property is individual property. No formal proceedings in condemnation are necessary to this result. Where, however, there is a denial of private right in an alleged patent, and the invention is nevertheless appropriated or used by the Government, the appropriation's in the nature of a tort, and an action thereon-is not within the general jurisdiction of this court. So if it had not been disputed that the Sehillinger patent was valid and the invention had been used by the Government, acting through a competent agent, a contract for royalty would be implied.”
The latest case upon this point decided by the Supreme Court is that of Palmer v. The United States (128 U. S., 262). It appeared that Palmer had exhibited his invention to a board of army officers, which recommended its adoption to the War Department. This recommendation was approved by the General of the Army, and the Secretary of War adopted the device as a part 6f the equipment of infantry. The Government thereupon manufactured and used the patented invention. Action being brought here to recover royalty upon the theory of an implied contract, plaintiff was successful, and the judgment was affirmed by the Supreme Court upon appeal. The court held that the user was not in tort, and in delivering the opinion Mr. Justice Bradley said:
“ The Government used the claimant’s improvements with his consent; and certainly with the expectation on his part of receiving a reasonable compensation for the license. This is not a claim for an infringement, but a claim of compensation for an authorized use — two things totally distinct in the law, as distinct as trespass on lands is from use and occupation under a lease. The first sentence in the original opinion of *77 tbe court below strikes the keynote of the argument on this point. It is as follows: t The claimant in this case invited the Government to adopt his patented infantry equipments, and the Government did so. It is conceded on both sides that there was no infringement of the claimant’s patent, and that whatever the Government did was done with the consent of the patentee and under his implied license.’ We think that an implied contract for compensation fairly arose under the license to use, and the actual use, little or much, that ensued thereon. The objection, therefore, that this is an action for a tort falls to the ground.”
We now turn to the findings of fact in the case at bar to discover whether, under the principles thus set forth, plaintiffs have established relations in contract with defendants. It appears, generally, that the War Department is early and regularly informed of all improvements and inventions in firearms; the Department’s attitude toward inventors in ordnance has been one of neutrality; it has neither denied nor admitted the legal rights, if any there were, of inventors; in an endeavor to perfect the Government arms, that Department has taken advantage of all knowledge within its reach and of all inventions; it does not deny the claims of inventors, but has proceeded upon the policy that executive officers should not decide upon such demauds upon the Government or upon conflicting claims, but tb at the claims should be presented without prejudice before some other tribunal than an executive department. This being the general policy of the Department, we find as to the case at bar that the following course has been pursued as to the extractor-ejector device.
Plaintiffs were in .constant communication with the ordnance officers through their agent, the inventor of the patented devices. These officers were early acquainted with the Berdan inventions, whose use the patentee urged upon them. In 1867 Berdan showed the extractor-ejector device (patent Uo. 88436) to the commandant of the Springfield armory; in August, 1868,'he explained the device to the Chief of Ordnance, who said that if defendants should use any of the features of the Ber-dan device “they expected to pay for them when the claimant had gone through the proper channels and settled the claim.”
Plaintiffs had urged the adoption of their devices by the Government and had demanded compensation therefor. It was evidently with an intention ‘o obtain such compensation *78 that Berdan conversed with the Chief of Ordnance, and it is undoubtedly as a sequence to that conversation that the Secretary of War wrote the Secretary of the Interior upon August 12,1868, transmitting a communication “ from JET. Berdan, asking that his application for patents for various improvements in firearms be acted upon immediately by the Patent Office, in order that he may present his claims against thisDe-partment for its use of said inventions,” and stating “ that, so far as this Department is concerned, the early consideration of the aforesaid claims is regarded as being desirable.” The application for patent No. 88436, covering the extractor ejector device, was then pending in the Patent Office; experiments were then taking place at Springfield to perfect an extractor-ejector, and in the following November the device now used in the Government musket was adopted by an order from the Acting Chief of Ordnance.
In 1873 the device for extracting and ejecting the shell was shown to a board of officers detailed to test guns, and was fully described in their official report.
The statute of limitations began to run against plaintiff’s cause of action July 26, 1881, if we are correct in our conclusion upon this subject. (See previous opinion.) Prior to this, and in 1874, General Benéb became Chief of Ordnance; he was familiar with the Berdan device, which he considered “as seemingly identical — certainly the mechanical equivalent” of the Springfield device for extracting and ejecting the shell, and he has continued the manufacture of the extractor-ejector upon this understanding, and upon the understanding that the Government would pay for the use of the invention through the instrumentality of the courts.
We find, then, in these faots a tender of the device to the Government, and a use of the device knowingly (certainly since 1874), in the belief that the Government would be called upon to pay royalty for the device, provided the understanding of the Chief of Ordnance was correct — that is, provided the Government was doing what he believed they were doing — manufacturing and using plaintiff’s device or its mechanical equivalent.
The use by the Government was not a mistaken use, for the Chief of Ordnance understood he was doing what we have decided he was doing, to wit, using plaintiff’s device. It was *79 not an unauthorized use, for the Chief of Ordnance has a very broad power in matters of this description (Rev. Stat., § 1164). It was not a use in ignorance, for the Chief of Ordnance was fully informed of all the facts; it was not an antagonistic use, for plaintiffs were anxious that defendants should adopt and use their devices.
The only element of doubt seems to have been whether the ordnance officers should decide finally what they believed to be true, that plaintiffs were entitled to compensation, or whether they should leave that matter to the courts or to some other competent authority.
We are of opinion that, under the rulings of the Supreme Court and of this court, heretofore cited, the facts disclose a contract between the parties to this action for the use of the extractor-ejector device.
Having decided that the patented device has been used by the Government under an implied contract, we must endeavor to find the fair and reasonable value of a license to manufacture and use the protected invention, “ being such a royalty as it may reasonably be presumed the defendants would have been willing to pay and the claimant to accept, if the matter at the outset had gone to an express agreement ” (McKeever v. The United States, 14 C. Cls. R., 425). We meet immediately the difficulty presented in most patent^ cases against defendants, namely, that the Government is necessarily the only user of the device, and that there are no sales or license to others from which á market value can be found. In this case the elements from which we are to determine what is a reasonale royalty are meager.
Experts have been examined, and have given their opinions as to what would be a just compensation to plaintiffs. These witnesses are officers of the.Army, of great experience in the use of military firearms, and they know the cost of manufacture ; but it does not appear upon what facts they base their opinions, or that they are familiar with the royalties paid upon other similar devices by this or other governments or by private individuals. Such value as evidence of this character has consists only in the fact that it may tend to show what these officers, acting for the United States, would be willing to pay for a device of this nature were-it now first presented, and were they free to contract for defendants; at the same time, *80 it must be remembered that this testimony is given after the event and without the pressure of present official responsibility.
There also appear two licenses to use other inventions of a similar character (those of Ball and Miller), but in one case the royalty was paid as a compromise to avoid litigation, and in the other case but one element of an ejector was in question. There is also shown a sale of muskets containing the Berdan device to Spain; but this contract is involved with the sale of cartridges and a cartridge machine, and the royalty seems to have been paid, not for the extractor-ejector alone, but for the gun, which contained other devices.
We have also plaintiffs’ bids to the Hancock Board; but these bids were made in 1866, when the art was in its infancy, and were for a complete jnusket, in which a most valuable element was the breech mechanism, and in which the extractor-ejector-device (not that in question here) was not a success and was speedily abandoned by the inventor; nor earn much importance-be attached to the long list of bids made in 1866 by many inventors. Some of these bids we know covered a complete structure; others, we have reason to believe, covered but portions-of the structure — perhaps single elements therein; all were made while the art of constructing breech-loading arms was inchoate; many (probably) were made with the single view to-adapting to modern uses the large stock of muzzle-loaders in the Government arsenals, and not for the construction of new guns. For similar reasons the Morse license is entitled to little weight, being made for a complete and novel structure, being made in 1858, and covering a very small number of guns. So with the payment to the Millers, which was in settlement of a single element in the combination.
Such are the details of fact from which we must deduce the ultimate fact of the measure of compensation which these plaintiff's should receive for the use of one device owned by them in defendants’ Springfield rifle. No one of these details alone is-entitled to great weight; taken together they may be of aid in fixing a fair royalty; they vary from 10 cents to over $2 per gun. We must first place ourselves in the position occupied by the contracting parties in 1869, when the patent was issued. Since Morse’s time the art had advanced. No longer do we see but one inventor with a completed structure practically the- *81 only efficient arm of the type in existence, but we find a field crowded with devices combining innumerable mechanical combinations, presented in some two thousand patents, and we know not how many other failures which have been forgotten.
At that time (1868-1869) every single element of an extractor-ejector combination was old in mechanics. The result áimed at was recognized by all. Several had nearly achieved that result, so that there was left only a most narrow margin of improvement. How narrow that márgin was we have seen; how naturally it would be crossed under the strain of competition is shown by the fact that two men, working independently, achieved an equal measure of success. In 1869 the defendants had open to their choice very many devices, and there remained the probability of still further improvements, for the art was in a feverish state and invention was rapidly succeeding invention. There was then no element of certainty. Now, after twenty years, we may conclude that the device adopted was the best possible,* but then no one could know what the next day would bring forth •, nor was it.then possible to foresee the great success which has since been achieved.
We know now that the Springfield extractor-ejector device is valuable; that it is durable and useful; that it is believed to be the best known in the art for use in a single-fire musket of the Springfield type, but none of this was known in 1869. Then all was in doubt; neither side knew that with the Berdan-Adams device final success in extractor-ejector devices had been attained; nor did either side know what was the extent of danger from attack by other patentees whose devices very closely resembled that adopted. The quieting licenses we have cited are examples of the troubled state of the art at that time.
Lastly, the quality of the licensee and the quantity of the arms are to be considered. We are not discussing an exclusive license which should limit plaintiffs to the United States as their only customer. Admitting that they were to remain free to press their invention abroad, the adoption of it by their own Government had a certain value in itself. Of more importance is the large number of arms to be manufactured, for he who deals by wholesale charges a less percentage of profit than he who deals by retail, especially when he is put to no cost of manufacture.
*82 From all this we deduce these elements of importance to a -contract made in 1809 — value in the invention, uncertainty in the art, danger of litigation, a valuable customer, a large contract, comparative cheapness of production, and lack of novelty in any element of the combinationn. Nor must we forget the Miller plate, for which the Government has paid. *
It appears that Éerdan offered a complete gun in 1866 to the Government for $ 1.25 each for over 200,000 guns. The extractor device in that gun was not a success for a center-fire cartridge, but the breech mechanism was approved as the best plan known. There were paid to inventors of ejectors, for the purpose of quieting possible proceedings in infringement, some 10 cents per gun; there was paid to Miller by plaintiffs for his extractor plates, used in asmall number of muskets, a trifle less than an average of 10 cents for each plate, and he was settled with by defendants for $20,000. The Spanish Government paid about $2.50 for aD entire gun purchased in small numbers and under some complications. Military experts place the fair royalty for the device at $2.66f per gun. The saving in manufacture is $1.25 per gun, the cost of making the gun ran (during the years in question) from $12.72 to $11.88. From these elements (all set forth in the findings), and following the reasoning in McKeever’s case (supra), we conclude that a fair and reasonable royalty for the right to manufacture and use the extractor-ejector device was 5 per cent, of the minimum cost of manufacturing the gun during the period in question. Judgment for plaintiffs in the sum of $95,004.36.