James C. HOBBS, Petitioner,

v.

UNITED STATES of America, ATOMIC
ENERGY COMMISSION, Respondent.

No. 30159.

United States Court of Appeals,
Fifth Circuit.

Oct. 28, 1971.

Rehearing Denied Dec. 20, 1971.

Richard B. Montgomery, Jr., New Orleans, La., B. D. Watts, Cleveland, Ohio, H. Struve Hensel, New York City, for petitioner.

William D. Ruckelshaus, Asst. Atty. Gen., Robert V. Zener, Atty., Dept. of Justice, Washington, D. C., Joseph F. Hennessey, Roland A. Anderson, Asst. Gen. Counsel, John A. Horan, Atomic Energy Comm., John N. Mitchell, Atty. Gen., Morton Hollander, Chief, Appellate Section, Dept. of Justice, Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., for the United States.

Before WISDOM, BELL, and AINSWORTH, Circuit Judges.

WISDOM, Circuit Judge:

This appeal concerns a claim against the government for just compensation for the Atomic Energy Commission's allegedly unlawful taking of James C. Hobbs's rights in certain inventions essential to the production of The Bomb. The matter is before this Court for the second time.

The gas involved in the production of fissionable material had never before been produced in quantity. It was highly corrosive. It had to be handled at subatmospheric pressure. Its mixture with moist air or grease would render it highly dangerous. The valves required had to be leakproof. Each valve of the thousands used on miles of pipe had to meet the unheard-of test of resisting leakage of air sufficient to increase the pressure in the pipe a micron of mercury, equivalent to one atmosphere increase in over eighty years. No known valve was suitable for Oak Ridge. James C. Hobbs had the inventive ability to design valves that proved to be suitable. They were vital to the war effort and may have greater value in developing peaceful uses for nuclear fission.

## I. The Facts

On December 14, 1942, the federal government contracted with M. W. Kellogg Company for Kellogg to design and build a plant at Oak Ridge, Tennessee, for the production of fissionable material for the world's first nuclear weapons. The government entered into a similar contract with Kellex Corporation, a subsidiary incorporated for purposes of the contract. On June 25, 1943, the United States contracted with Crane Company for Crane to manufacture valves and fittings required for the gaseous diffusion plant under the direction and supervision of Kellex.

James C. Hobbs, a mechanical engineer who had several inventions to his credit, agreed to work for Kellex as a part-time general consultant on September 9, 1943. Although Kellex's contract with the government required it to assign rights to all patentable discoveries over to the government and to secure patent waiver forms from all employees, Hobbs, at the time of his initial employment, and repeatedly thereafter, refused to waive or assign any patent rights he might have. The government was so informed on March 3, 1945.

Although the exact urgency of the situation existing at Oak Ridge in the fall of 1943 is unclear, it appears that development of a gate valve (G valve) was essential to the completion of the project. At a conference held in Chicago on November 4–6, 1943, Hobbs first submitted a design for the G valve. He was soon given full responsibility on behalf of Kellex for the work on the development of special valves to be used at Oak Ridge including the G valve and instrument valve (H valve). The design for the G valve was eventually frozen about January 1, 1944, and the design for the H valve was approved sometime during June 1944. Hobbs developed both in cooperation with the employees of Crane.

On February 15, 1945, Hobbs filed an application for a patent on the G valve. After prolonged negotiations between Hobbs and the Patent Office, the Office

issued Hobbs Patent No. 2,520,364 on August 29, 1950. On March 26, 1946, Hobbs filed an application for a patent on the H valve. The Patent Office issued Patent No. 2,617,621 on this valve on November 11, 1952.

The Oak Ridge plant was equipped with over five thousand G valves and over 51,000 H valves made by Crane. Three additions were later made to the Oak Ridge plant and additional plants were built at Paducah, Kentucky and Portsmouth, Ohio. A version of the G valve furnished by M. L. Bayard Company and the Linde Company was employed in the new plants. A version of the H valve for use in the new plant was furnished by Hoke Incorporated and Fulton-Sylphon Control Division of Robertshaw-Fulton Controls Company. G valves purchases from Crane amounted to $6 million and H valve purchases $500,-000. $19 million worth of Bayard and Linde G valves and $300,000 worth of Hoke and Fulton-Sylphon H valves were purchased between 1949 and 1955.

II. *The Proceedings*

The present proceedings were commenced on October 9, 1956, when Hobbs filed an application with the Patent Compensation Board of the Atomic Energy Commission for compensation under the Atomic Energy Act of 1946, 42 U.S.C. § 1801 et seq. (1952 ed.), 60 Stat. 755 et seq. (1946), seeking compensation for the alleged taking and use by the government of the valves described in the G valve and H valve patents issued to Hobbs. The Board denied compensation and the Commission refused review. In re Hobbs, 136 U.S.P.Q. 489 (1963). The Board held "that the inventions of Applicant [Hobbs] were made under such circumstances and conditions as would give to the Government, through its contract with the Kellex Corporation, shop rights." *Id.* at 496–497. This Court reversed the Commission and remanded the case. Hobbs v. United States, 5 Cir. 1967, 376 F.2d 488. The Board held additional hearings, and again denied compensation. In re Hobbs, 165 U.S.P.Q. 99

(1970). The Commission adopted the opinion of the Board. The Board's opinion contains 108 separate findings of fact, some self-contradictory both as to the standards applied and the results reached. Its "Conclusions of Law", however, are succinctly stated:

1. The Hobbs Patent No. 2,520,364 is invalid in view of the prior art.

2. Claims 1, 2, 3, 4 and 6 of the Hobbs Patent No. 2,617,621 are invalid in view of the prior art. Claims 5 and 7 of that patent distinguish the prior art but are not infringed.

3. The Hobbs Patent No. 2,617,-621 is invalid in view of the statutory bar of "public use".

4. Applicant, J. C. Hobbs, is the sole inventor of the subject matter claimed in Claims 4, 6 and 8 of Patent No. 2,520,364.

5. Applicant, J. C. Hobbs, is not the sole inventor of the subject matter described by the claims of Patent No. 2,617,621.

6. Claims 4 and 6 of Patent No. 2,520,364 are not infringed by the valves supplied by the M. L. Bayard Company nor by the valves supplied by the Linde Company.

7. Any just compensation which the Applicant may be entitled to receive shall be determined by evaluating the Applicant's contribution and deducting therefrom the cost of the Government of materials used and work done by those other persons who were engaged in the effort which resulted in the development of the invention used by the Government for which use just compensation is sought.

8. The Government did not acquire equitable rights in all valves related to the Hobbs Patents Nos. 2,-520,364 and 2,617,621 by reason of Hobbs's employment and relationship to the Government.

9. The Government did not acquire the right to use valves purchased by the Government prior to Hobbs's assertion of a claim against the United States.

10. No valid basis for the grant of just compensation under either the Atomic Energy Act of 1946 or the Atomic Energy Act of 1954 has been proven.

*Id.* at 145. Hobbs's petition for review is before this Court under Section 189 (b) of the Atomic Energy Act of 1954, 42 U.S.C. § 2239(b), directing review in accordance with 28 U.S.C. §§ 2341–2352 and 5 U.S.C. §§ 701–706.

### III. *The Law—The Atomic Energy Act of 1946*

Although the case is here for review under the 1954 Act, the substance of Hobbs's claims is governed by the 1946 Act.[1] Hobbs v. United States, 5 Cir., 1967, 376 F.2d 488. *See also* N. V. Philips' Gloeilampenfabrieken v. Atomic Energy Commission, 1963, 114 U.S.App. D.C. 400, 316 F.2d 401; Anderson v. United States Atomic Energy Commission, 7 Cir. 1963, 313 F.2d 313. The key provisions of the 1946 Act drastically limited the patentability of inventions used in the production of atomic energy:

Sec. 11. (a) Production and Military Utilization.

(1) No patent shall hereafter be granted for any invention or discovery which is useful solely in the production of fissionable material or in the utilization of fissionable material or atomic energy for a military weapon. Any patent granted for any such invention or discovery is hereby revoked, and just compensation shall be made therefor.

(2) No patent hereafter granted shall confer any rights with respect to any invention or discovery to the extent that such invention or discovery is used in the production of fissionable material or in the utilization of fis-

sionable material or atomic energy for a military weapon. Any rights conferred by any patent heretofore granted for any invention or discovery are hereby revoked to the extent that such invention or discovery is so used and just compensation shall be made therefor.

\* \* \* \* \* \*

(b) Use of Inventions for Research. —No patent hereafter granted shall confer any rights with respect to any invention or discovery to the extent that such invention or discovery is used in the conduct of research or development activities in the fields specified in section 3. Any rights conferred by any patent heretofore granted for any invention or discovery are hereby revoked to the extent that such invention or discovery is so used, and just compensation shall be made therefor.

60 Stat. 768.[2] Section 11(d) provides for the Commission's acquisition of patents:

(d) Acquisition of Patents.—The Commission is authorized to purchase, or to take, requisition, or condemn, and make just compensation for, (1) any invention or discovery which is useful in the production of fissionable material or in the utilization of fissionable material or atomic energy for a military weapon, or which utilizes or is essential in the utilization of fissionable material or atomic energy, or (2) any patent or patent application covering any such invention or discovery.

60 Stat. 769. *See also* Atomic Energy Act of 1946, § 13(a), 60 Stat. 772. The initial responsibility for assessing "just compensation" is placed with the Patent Compensation Board of the Atomic Energy Commission by § 11(e) (1). 60

---

1. Because the 1946 Act was extensively amended in 1954, the current issues of United States Code and United States Code Annotated do not contain the original text of the Act which governs the disposition of this case. All citations therefore are to Volume 60 of United States Statutes at Large (1946) wherein

the original Act is printed. The Act is also found in 42 U.S.C. § 1811 et seq. (1952 ed.). For the convenience of the reader, relevant portions of the 1946 Act are printed in the text and footnotes of this opinion.

2. Hobb's contention as to § 11(a) (3) of the Act will be discussed below.

Stat. 769. Standards for assessing just compensation are stated in § 11(e) (3) (B):

> (B) In determining what constitutes just compensation under subsection (a), (b), or (d) above, the Commission shall take into account the considerations set forth in paragraph (A) above, [any defense, general or special, that might be pleaded by a defendant in an action for infringement, the extent to which, if any, such patent was developed through federally financed research, the degree of utility, novelty, and importance of the invention or discovery, and may consider the cost to the owner of the patent of developing such invention or discovery or acquiring such patent.] and the actual use of such invention or discovery, and may determine that such compensation be paid in periodic payments or in a lump sum.

60 Stat. 770.

### IV. *The Issues*

On appeal this Court must resolve eleven key issues:

1. Is the G valve patent invalid because of the statutory bars of "in public use or on sale"?

2. Is the G valve patent invalid because of the prior art?

3. Is the G valve patent invalid because Hobbs was not the sole inventor?

4. Was the G valve patent infringed?

5. Is the H valve patent invalid because of the statutory bars of "in public use or on sale"?

6. Is the H valve patent invalid because of the prior art?

7. Is the H valve patent invalid because Hobbs was not the sole inventor?

8. Was the H valve patent infringed?

9. May Hobbs recover just compensation under § 11(a) (3) of the Atomic Energy Act of 1946?

10. What is the amount of compensation to which Hobbs is entitled?

11. To what extent were the patents developed through federally financed research?

### V. *Requirements, a Presumption, Quantum of Proof, and a Standard of Review*

In view of the complicated nature of this case, we consider it appropriate to summarize the applicable underlying principles of law.

#### A. *Requirements.*

Federal statutes delineate specific requirements for patentability. First, to be patentable an invention must be "new and useful".

> Whoever invents or discovers any new and useful process, machine manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 101. No contention is made in this case that Hobbs's patented inventions are not "new and useful." Second, the statute specifies certain conditions, usually referred to as "statutory bars", which prevent the patenting of an invention. Those pertinent here are the statutory bars of "in public use or on sale" and sole inventorship:

> A person shall be entitled to a patent unless—
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (f) he did not himself invent the subject matter sought to be patented or &ast; &ast; &ast;,

35 U.S.C. § 102. Finally, in order to be patentable, an invention must be "nonobvious":

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in sec-

tion 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 103. The requirements for patentability are important to this case because, as this Court has held: "when the government establishes a defense, such as unpatentability, which negatives the existence of any rights in the inventor, the defense would be a complete bar to compensation. The Act would have deprived the inventor of nothing of value." Hobbs v. United States, 5 Cir. 1967, 376 F.2d 488, 493. *See* 35 U.S.C. § 282 (2).

B. *Presumption.* Pervading the arguments advanced in this case and influencing the result is the presumption of patent validity. That statutory presumption dictates: "[a] patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it." 35 U.S.C. § 282. See Kardulas v. Florida Machine Products Co., 5 Cir. 1971, 438 F.2d 1118; Metal Arts Co. v. Fuller Co., 5 Cir. 1968, 389 F.2d 319.

█ C. *Quantum of Proof.* The presumption of patent validity is rebuttable. 35 U.S.C. § 282; Radio Corp. of America v. Radio Engineering Laboratories, 1934, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163. The courts, however, have not distinguished themselves for consistency in their determination of the quantum of proof necessary to rebut the presumption. For instance, this Court has employed varying statements of the necessary quantum of proof. *See, e. g.,* Kardulas v. Florida Machine Products Co., 5 Cir. 1971, 438 F.2d 1118 ("clear and convincing \* \* \* a mere preponderance of the evidence is insufficient \* \* \* beyond a reasonable doubt"); V & S Ice Machine Co. v. Eastex Poultry Co., 5 Cir. 1971, 437 F.2d 422 ("competent evidence"); Stamicarbon, N. V. v. Escambia Chemical Corp., 5 Cir. 1970, 430 F.2d 920 (reviewing all the standards and approving the use of the beyond-a-reasonable-doubt standard); Kiva Corp. v. Baker Oil Tools, 5 Cir. 1969, 412 F.2d 546 ("beyond a reasonable doubt \* \* clear and convincing"); Metal Arts Co. v. Fuller Co., 5 Cir. 1968, 389 F.2d 319 ("clear, satisfactory, and, by some it is said beyond a reasonable doubt"); Zero Mfg. Co. v. Mississippi Milk Producers Assoc., 5 Cir. 1966, 358 F.2d 853 ("strong rebuttal"); Southern Implement Mfg. Co. v. McLemore, 5 Cir. 1965, 350 F.2d 244 ("beyond a reasonable doubt"); Samuelson v. Bethlehem Steel Co., 5 Cir. 1963, 323 F.2d 944 ("Any reasonable doubt will be resolved against the party alleging the invalidity of a patent"); Fairchild v. Poe, 5 Cir. 1958, 259 F.2d 329 ("beyond a reasonable doubt"); Zachos v. Sherwin-Williams Co., 5 Cir. 1949, 177 F.2d 762 ("beyond a reasonable doubt"). We do not attempt to resolve this apparent inconsistency. Rather, we state that the presumption of patent validity may be rebutted only by a quantum of proof—whether it be called clear and convincing or beyond a reasonable doubt—which is greater than a mere preponderance of the evidence. One who seeks to rebut the presumption bears a heavy burden. *Cf.* Radio Corp. of America v. Radio Engineering Laboratories, 1934, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163.[3]

---

3. For a full discussion of this issue see Stamicarbon v. Escambia Chemical Corp., 5 Cir. 1970, 430 F.2d 920. In that case, while alluding to the fact that the parties agreed to the "clear and convincing" standard, this Court approved a "beyond a reasonable doubt" standard. The most recent case in this Circuit on the subject uses a "clear and convincing standard" in assessing a § 102(b) prior use defense and a "beyond a reasonable doubt" standard in assessing a §§ 101 and 103 defense. Kardulas v. Florida Machine Products Co., 5 Cir. 1971, 438 F.2d 1118.

The Board's opinion below does not state which standard it used in assessing

**D. Standard of Review.** Review of the Board decision is governed by the standards articulated in Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

[A] reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.

340 U.S. at 488, 71 S.Ct. at 465. In applying the "substantial evidence" standard of review, we recognize that the determination of the Board must not be lightly disregarded, in light of the expertise of the members of the Board and the opportunity the Board has to assess witness credibility and otherwise evaluate evidence. See Deutsch v. United States Atomic Energy Comm., 1968, 130 U.S.App.D.C. 339, 401 F.2d 404.

### VI. The G Valve—The "In Public Use or On Sale" Defense

As previously pointed out, had Hobbs's G valve invention been "in public use or on sale" more than one year prior to February 15, 1944, the date of the filing of his patent application, his discovery would have been unpatentable and his right to just compensation precluded.

35 U.S.C. § 102(b). The Board was of the view that, if the contract between Crane and the United States was found to be a sales contract, the invention was "on sale" and the statutory bar operated to prevent patentability. Two members of the Board concluded that the facts constituted a placing "on sale" through a *sales* contract; the other two members construed the contract as one for services. The Board was, however, unanimous in concluding that the statutory bar applied if the relationship between Crane and the government was that of buyer and seller. The entire Board advanced additional reasons for its view as to the applicability of the statutory bar. After considering the contract, the views of the Board and the contentions of the parties, we conclude that the G valve was "on sale" more than one year prior to the filing of the patent application.

The contract, variously characterized as a sales contract and as a services contract, consisted of a letter contract dated June 25, 1943, and a formal contract dated February 29, 1944, incorporating the letter contract and effective as of the date of the letter contract. A careful examination of the contract leads us to conclude that it is a "sales contract" as that term is used in general contract law.[4]

the evidence which sought to rebut the presumption. The Board merely stated:

That the Board has reached conclusions which are at variance with the earlier decisions of the highly respected Patent Office is greatly regretted. That the courts sometimes hold patents to be invalid upon the same documentary evidence considered by the Patent Office is a well-known fact of life and no doubt results from the circumstances that the prosecution of a patent application is an ex parte proceeding, without the testimony of experts and others, and the usual court proceeding results in the production of testimony of which the Patent Office has had no knowledge. Even when the same documentary evidence was before both the Patent Office and the Court, as was the case here with the "G" valve patent, there may still exist an honest difference of opin-

ion. The Board after giving full and extended consideration to the testimony, documentary evidence and briefs, has rendered a decision in accordance with its best judgment.

165 U.S.P.Q. 144.

4. "It is customary, where Congress has not adopted a different standard, to apply to the construction of government contracts the principles of general contract law." Priebe & Sons v. United States, 1947, 332 U.S. 407, 411, 68 S.Ct. 123, 125, 92 L.Ed. 32, 38. For the purposes of construing this contract, we assume that the provisions of the Uniform Sales Act, which was in wide use at the time of the making of this contract, accurately reflected "general contract law." See M. F. Pofcher, "The Choice of Law, State or Federal, in Cases Involving Government Contracts," 12 La.L.Rev. 37 (1951) and cases cited therein.

The introductory paragraph of the letter contract provides:

THE UNITED STATES OF AMERICA acting through the undersigned Contracting Officer, hereby places an *order* with you to *manufacture or procure* valves and fittings required for process and auxiliary lines for a process plant in accordance with such operating conditions, limitations, features and other matters as may be specified in secret communications from The Kellex Corporation from time to time and in accordance with drawings and specifications approved by it. You are directed to proceed immediately to *prepare the necessary facilities for use and to procure the necessary materials, equipment, fixtures, tools, dies and jigs and to commence the manufacture of such valves and fittings* to the end that they may be delivered to the government at the earliest practicable date * * * (emphasis supplied)

The formal contract defined the "Scope of the Contract" to include the responsibility of Crane to:

(c) *Manufacture, furnish, clean, test and deliver,* f. o. b. Contractor's plant, valves in the sizes and quantities on or before the delivery dates specified and for the consideration set forth in Schedules "B" and "C" hereto annexed and made part hereof. Such valves shall be in strict accordance with the designs, drawings, and specifications which are to be developed and furnished by the Contractor as provided in Article III hereof. (emphasis supplied)

The parties repeatedly used terms such as "order," "manufacture," "procure," "delivered," and "price." The contract was titled a "Supply Contract" and was declared to be a "Contract for: Valves & Fittings." In view of the duties and responsibilities of the parties under the contract and the form which the contract took, one would have to say that the contract is a "sales contract" under general contract law.[5]

■ In arguing that the contract was not a sales contract, two of the Board members and Hobbs contend that (1) the contract provides for periodic price adjustments, (2) the contract gave the government the option to provide materials for the manufacture of the valves, (3) Crane was selected for its ability to design valves, and (4) some of the work done under the contract was to be at no profit to the manufacturer.

First, although the contract did provide for periodic adjustment of prices, price renegotiation clauses were common features of war contracts and, more importantly, in no way prevent the contract from being classified as a sales contract.[6] If anything, the use of the term "price" rather than "fee" or "salary" reinforces the conclusion that a sales contract was contemplated. Second, the government was, by Article XXVII of the contract, granted the option to provide material and this, it is argued, established a "bailment" with Crane performing services on materials to which the government held title. There is no evidence in the record that the government ever actually exercised its option and supplied materials. However, the option

---

5. A contract to sell goods is a contract whereby the seller agrees to transfer the property and goods to the buyer for a consideration called price.
Uniform Sales Act § 1(1).
A sale of goods is an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price.
*Id.* § 1(2). The corresponding definitions of the more recent Uniform Commercial Code are found in § 2–106(1).

"Contract for sale" includes both a present sale of goods and a contract to sell goods at a future time. A "sale" consists in the passing of title from the seller to the buyer for a price.

6. Definition and ascertainment of price (1) The price may be fixed by the contract or may be left to be fixed in such manner as may be agreed, or it may be determined by the course of dealing between the parties.
Uniform Sales Act. § 9.

was just that, an option. Crane could either receive materials from the government or "enter into subcontracts and purchase orders for materials." Lest any doubt exist as to possession of title to material so acquired, the letter contract was explicit:

> You are authorized and directed to proceed immediately with such work and to enter into subcontracts and purchase orders for materials, supplies and equipment in furtherance thereof * * * If for any reason this order is terminated by the government before any formal contract is executed, the government binds itself to reimburse you for the costs incurred in the performance thereof, and will assume your obligation for any commitments which you may have made in this connection, but not to exceed the amount above specified. *Upon such payment and assumption title to all materials and to all rights under any commitment assumed will vest in the government.* (emphasis supplied)

Because title to materials remained in Crane until delivery of the finished product, the relationship was that of seller and buyer rather than bailor and bailee. Third, admitting that Crane may have been selected for its abilities in the area of design, Crane was bound by contract not only to design but also to "manufacture [and] furnish" valves. Even though a buyer may select his seller because of expertise in services, this does not preclude a contract which provides for production and delivery of goods from being a sales contract. Finally, assuming that certain clauses of the contract provided for prices to be paid to Crane which included no profit, the contract may nevertheless establish a "sale" which is sufficient to invoke the statutory bar. *See* Elizabeth v. Pavement Co., 1878, 97 U.S. 126, 24 L.Ed. 1000; Application of Blaisdell, 1957, 242 F.2d 779, 44 C.C.P.A. 846. Even if a sale without profit were insufficient, the fact remains that the contract did contemplate profit as to most of the valves.

▌ The mere existence of a sales contract is insufficient to establish a

placing "on sale". The invention that is the subject of the sale must be a reality in the sense that it must be beyond the stage of experimentation. Stamicarbon, N.V. v. Escambia Chemical Corp., 5 Cir. 1970, 430 F.2d 920. It is clear from the evidence that the G valve was a reality more than one year prior to February 15, 1944 the date of the filing of the patent application. The Board unanimously so found on the basis of substantial evidence, and we agree. In reaching this conclusion we rely upon (1) minutes of a meeting held December 29 and 30, 1943, called by Hobbs to "freeze" the design for the G valve so that production could begin; (2) a memorandum written by Hobbs on January 3, 1944, stating that "production has been started on the valves;" (3) a January 8, 1944 letter in which Kellex's specifications for the G valve are transmitted to Crane; (4) a letter dated January 11, 1944, in which Hobbs transmitted to Crane the manufacturing design; (5) the results of a successful test of the G valve made on January 13, 1944; (6) a request by a Kellex employee to send order sheets to Crane dated January 15, 1944; (7) the issuance by Crane of production orders on February 4, 1944; and (8) the transmittal by Kellex on February 7, 1944 of shipping specifications to Crane. It should be noted that an invention passes out of the experimental stage and becomes a reality for purpose of the statutory bar even though it may later be refined or improved. Minnesota Mining & Mfg. Co. v. Kent Industries, 6 Cir. 1969, 409 F.2d 99 and cases cited therein. Even if no delivery was made more than one year prior to the filing of the patent application, the existence of the sales contract for the G valves, plus the reduction of that invention to a reality constitutes the placing "on sale" required by the statute. Strong v. General Electric Co., 5 Cir. 1970, 434 F.2d 1042. *See* Minnesota Mining & Mfg. Co. v. Kent Industries, 6 Cir. 1969, 409 F.2d 99; Tucker Aluminum Products v. Grossman, 9 Cir. 1963, 312 F.2d 293.

▌ Hobbs argues that the "on sale" bar is inapplicable unless the in-

vention was placed on sale by the inventor himself. It has however long been settled that placing on sale may be by the inventor or another, with or without the consent of the inventor. Andrews v. Hovey, 1887, 123 U.S. 267, 8 S.Ct. 101, 31 L.Ed. 160. Hobbs further contends that the placing on sale, if it took place at all, was done under conditions of secrecy which prevents the operation of the statutory bar to patentability. His argument is basically an attempt with no support from precedent to construe the statute so that "public" in the phrase "in public use or on sale" modifies not only "use" but also "sale". This unrealistic construction has been urged elsewhere and rejected. Piet v. United States, 1959, S.D.Cal., 176 F.Supp. 576, aff'd 9 Cir. 1960, 283 F.2d 693. We cannot attach any relevance to any conditions of secrecy which may have existed at the time the G valve was placed "on sale." [7]

Because there is clear and convincing evidence which persuades this Court beyond a reasonable doubt that the G valve was placed "on sale" more than one year prior to the filing of the patent application, the invention was not patentable and the presumption of patentability is rebutted. Because the invention was not patentable, the Board properly denied compensation as to the G valve.[8]

In view of our disposition of the issue of "in public use or on sale," we need not consider the other issues concerning the G valve.

---

7. Secrecy may be relevant to the issue of "public use." *See* Kardulas v. Florida Machine Products Co., 5 Cir. 1971, 438 F.2d 1118; Watson v. Allen, 1958, 103 U.S.App.D.C. 5, 254 F.2d 342.

8. We do not approve or disapprove the discussion of the Board as to the G valve and the grounds advanced in their opinion for denying compensation.

9. This self-contradiction might be explained by the following sequence of events. In its Proposed Findings of Fact, the government urged Proposed Finding No. 153, which eventually became Finding No. 75 of the Board's opinion, quoted above, and Proposed Finding No. 154 which read:
 154. The H valve as disclosed and claimed in Hobbs' patent 2,617,621

## VII. *The H Valve—The "In Public Use or On Sale" Defense*

The Board's discussion of the "in public use or on sale" statutory bar as applied to the H valve is confusing. Finding of Fact No. 75 states:

"H" valves made by Crane in accordance with War Department Contract W–7418–eng–18 * * * were used by the General Electric Company and by Union Carbide Corporation in the operation of the Oak Ridge Gaseous Diffusion Plant at least as early as March 2, 1945 * * * more than one year prior to the filing of Applicant's patent application S.N. 658,338 on March 29, 1946, which matured into U. S. Patent No. 2,617,621 * * *.

Similarly, "Conclusion of Law" No. 3 concludes, "The Hobbs Patent No. 2,617,-621 is invalid in view of the statutory bar of 'public use'." On the other hand, the Board reaches a diametrically opposite conclusion within the same opinion:

The proofs of "public use" of the "H" valve prior to March 29, 1945, the critical date, are insufficient to meet the legal requirements which must be met to establish the defense of "public use".

The Board holds that the defense of "on sale" is not effective against the "H" valve patent.

165 U.S.P.Q. 133.[9]

---

based upon patent application S.N. 658,338 filed March 29, 1946, was "on sale and (or) in public use" more than one year prior to the filing date of the patent.

Hobbs objected to these Proposed Findings and to Conclusion of Law No. 3, quoted above. The Board struck Proposed Finding No. 154 from its opinion, but failed to strike Proposed Finding No. 153 and Conclusion of Law No. 3. The Board added a discussion of the "in public use or on sale" defense which is partially quoted in our opinion, rejecting the applicability of that defense. It appears that Finding No. 75 and Conclusion of Law No. 3 should have been stricken from the opinion.

We are forced, therefore, to search this voluminous record to determine whether the evidence is sufficient to rebut the presumption of patent validity.

■ A. *"On Sale"* Granting the existence of a sales contract for the acquisition of H valves, there is insufficient evidence in the record to establish the existence, more than one year prior to the patent application, of the subject matter of that contract adequate to invoke the statutory bar. *See* Stamicarbon, N.V. v. Escambia Chemical Corp., 5 Cir. 1970, 430 F.2d 920. Admittedly there is evidence in the record of orders placed with Crane by Kellex for H valves prior to the critical date as well as requests for price information on the valves. However, there also is evidence that the valve was still in the experimental stage after March 29, 1945, and evidence of the necessity for redesign. Even if we were to resolve every doubt in favor of the government and completely disregard all contradictory evidence, we could not conclude that evidence existed of the placing "on sale" of the final H valve sufficient to rebut the presumption of patent validity.

We hold that the "on sale" statutory bar is ineffective to deny compensation.

■ B. *"In Public Use"* Evidence of public use more than one year before the patent application date is similarly insufficient to rebut the presumption of patent validity. The orders placed by Kellex with Crane fail to prove actual use of the H valve. Although much reliance is placed on a memorandum dated April 2, 1945, concerning use of the valves two months previous to that date, the document does not disclose whether the use was merely experimental or took place in the Oak Ridge plant after the experimental stage. The memorandum does indicate repeated failure in the performance of the valves "under operating conditions" and the need to "revis[e] the construction of these valves." At best this would indicate an embryonic stage of development rather than the "public use" of a completed invention. In addition, the government urges this Court to give conclusive weight to Finding of Fact No. 100 by the Board.

The Oak Ridge plant was equipped with at least 5578 "G" valves ranging in size from 3″ to 16″ in diameter, and about 51,152 "H" valves, went into operation on February 21, 1945, and continued to operate for many years in the production of special nuclear material.

165 U.S.P.Q. 112–113. The finding, however, is not only unsupported by any evidence we are able to glean from the record and devoid of any citation of evidence by the Board, but also contradicts subsequent language in the Board's opinion.

Because the record does not contain that quantum of proof—whether it be denominated "clear and convincing" or "beyond a reasonable doubt"—sufficient to rebut the presumption of patent validity, we hold that the "in public use" defense is unavailable to preclude compensation.[10]

VIII. *The H Valve—The "Prior Art" Defense*

Hobbs's right to just compensation is challenged because his patent is said to be invalid in view of the prior art. Sections 101–103, quoted above, state the basic prerequisites to patentability: novelty and utility as articulated and defined in §§ 101 and 102 and non-obviousness as set out in § 103. It is apparently conceded by the Board and the parties that the H valve patent fulfills the requirements of §§ 101 and 102; dispute centers around § 103. In discussing § 103, the Supreme Court has defined the relevant factual inquiries.

While the ultimate question of patent validity is one of law, [Great] A. & P. Tea Co. v. Supermarket [Equipment] Corp., supra, 340 U.S. [147] at 155, [71 S.Ct. 127] 95 L.Ed. [162] at 168, the § 103 condition, which is but

10. Because we find the proof insufficient to establish public use, we need not consider the relevance which the alleged secrecy has to that use.

one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

Graham v. John Deere Co., 1966, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545, 556. This Court has elaborated upon and applied these requirements in a variety of factual contexts. *See, e. g.,* Laitram Corp. v. Deepsouth Packing Co., 5 Cir. 1971, 443 F.2d 928; Deere & Co. v. Hesston Corp., 5 Cir. 1971, 440 F.2d 904; Ag Pro v. Sakraida, 5 Cir. 1971, 437 F.2d 99; Kardulas v. Florida Machine Products Co., 5 Cir. 1971, 438 F.2d 1118; Beckman Instruments v. Chemtronics, 5 Cir. 1970, 428 F.2d 555; Waldon v. Alexander Mfg. Co., 5 Cir. 1970, 423 F.2d 91.

The Board discussed the prior art, both art cited by the Patent Office and other art, and concluded as to the claims of the H valve patent:

The broader Claims 1, 2 and 3 are, therefore, in the opinion of the Board,

descriptive of valve constructions which have resulted from the substitution for an older bellows which functioned both as sealing member and spring, of a more modern equivalent which happened to have a thickened end wall, with obviously foreseeable results.

Claim 4 describes a single piece metal bellows having a skirt portion welded to the body. Securing the bellows skirt to the body by welding instead of a mechanically applied clamping member is thought to be advantageous in certain respects but is not, in the Board's view, a patentable concept. Claim 6 describes, in substance, the same combination of parts set forth in Claims 1, 2 and 3 and lacks inventive merit for the same reasons.

Claims 5 and 7 are of somewhat different scope in that each includes a "bonnet" for limiting the movement of the flow regulating member toward open position. Insofar as the record discloses, this is a novel feature of such a valve and Claims 5 and 7, therefore, do describe new combinations of elements so that these claims are to be seriously considered from the standpoints of validity and infringement.

165 U.S.P.Q. 129.[11] The Board's conclusion as to the validity of Claims 5 and

11. The Board's Findings of Fact Nos. 91–93 describe the claims.

91. Claim 1 of the "H" valve patent is generic to the several forms of the invention disclosed therein and reads as follows, numerals of the drawing being included in parentheses in the claim to indicate the identified elements:

1. A valve comprising a body (T) having a valve stem recess and inlet and outlet ports (9, 10) leading therefrom, a member (1) moveable in the recess to regulate flow of fluid through said recess, means (3) associated with said member and engaged with the valve body for positively moving the member to close the valve, and means (2) cooperating with said body for resiliently moving said member to open said valve, said valve opening means comprising a single piece metal bellows secured to said member and having fluid sealing

engagement with said body and having a wall portion of increased thickness (22) contacting said member and the member-moving means.

92. Claim 4 of the "H" valve patent is specific to the form of the invention shown in Fig. 1 of the patent and reads as follows, numerals on the drawing being included in parentheses in the claim to indicate the identified element:

4. A valve comprising a body (T) having a valve stem recess and inlet and outlet ports (9, 10) leading therefrom, a member (1) moveable in the recess to regulate flow of fluid through said recess, means (3) rotatable relative to and associated with said member and engaged with the body for positively moving the member to close the valve, and means (2) cooperating with said body for resiliently moving said member to open said valve, said valve opening

7 is not challenged on appeal, and we need therefore face only the question of the validity of Claims 1, 2, 3, 4, and 6.

 Bearing in mind the presumption of patent validity and the large quantum of proof necessary to rebut that presumption, we hold that there is not substantial evidence in the record upon which the Board could have based its decision as to invalidity. In reaching this decision we have considered (1) the Board's opinion below, (2) the patents cited by the Board, (3) the history of the Patent Office prosecution of the H valve patent, (4) the H valve patent itself, (5) the briefs of the parties, and (6) other evidence in the record upon which the Board might conceivably have relied.

In addition to our ultimate assessment of the nonobviousness, as that term is used to describe the requirements of § 103, of the H valve patent as a matter of law, several considerations weigh heavily in our decision. First, most of the prior art relied upon by the Board was explicitly cited, considered, and rejected by the Patent Office in the process of approving the H valve patent.[12] Other than conclusory statements, the Board in no way demonstrates why the rejection of this prior art by the Patent Office was erroneous. Despite the acknowledged expertise of Board members, we cannot, from this record and their confusing opinion, credit their unsupported assessment of the lack of expertise which the Board attributes to the Patent Office examiners.

 Second, the Board did cite and discuss prior art not specifically cited by the Patent Office.[13] It is recognized that, when prior relevant patents are not considered by the Patent Office, the presumption of patent validity is "weakened, if not totally destroyed." American Seating Co. v. Southeastern Metals Co., 5 Cir. 1969, 412 F.2d 756, 760; Beckman Instruments v. Chemtronics, 5 Cir. 1970, 428 F.2d 555; Waldon v. Alexander Mfg. Co., 5 Cir. 1970, 423 F.2d 91. There is no support in the record, however, or in the Board's opinion for the conclusion that the art discussed by the Board is in any way more relevant than that specifically cited by the Patent Office. Nor is there any reason to conclude, merely because the patents were not specifically cited by the Patent Office, that the Examiner did not

means comprising a single piece metal bellows having a skirt portion (23) welded to said body around said member and around one of said outlet ports and having a body portion of increased thickness (22) engaged with the rotatable member-moving means and secured to said member for movement therewith.

93. Claim 5 is specific to the form of the invention shown in Fig. 2 of the "H" valve patent and reads as follows, numerals on the drawing being included in parentheses in the claim to indicate the identified element:

5. A valve comprising a body (T) having a valve stem recess and inlet and outlet ports (43, 44) leading therefrom, a member (26) moveable in the recess to regulate flow of fluid through said recess, means (2) rotatable relative to and associated with said member and engaged with the valve body for positively moving the member to close the valve, means (27) cooperating with said body for resiliently moving said member to open said valve, said valve opening means comprising a single piece metal bellows secured to said member, said bellows being generally cup-shaped and having an end wall of increased thickness (51) contacting said valve member and contacting said rotatable member-moving means, means for limiting movement of said member toward its open position comprising a bonnet (28) screwed onto the body and secured fluid tightly to the valve opening means, and means (38) comprising an elastomeric gasket fluid-sealingly engaging said body and valve opening means.

12. These patents were the following: 1,859,834 to May; 1,956,027 to Heitman; 1,992,902 to McIntosh; 2,001,251 to Irving; 2,044,443 to Ott; 2,068,626 to Clifford; and 2,280,499 to Perkins.

13. These patents were the following: 1,360,833 to Vuilleumier; 1,527,154 to Mallory; and 2,265,496 to Shaw.

in fact consider them and cast them aside as less pertinent than those cited. *See* Artmoore Co. v. Dayless Mfg. Co., 7 Cir. 1953, 208 F.2d 1, cert. denied 347 U.S. 920, 74 S.Ct. 518, 98 L.Ed. 1075.

Third, it has long been settled that, despite apparent similarity to prior art, inventions may be patentable "when they perform different functions or in a different way, or produce a substantially different result." Machine Co. v. Murphy, 1878, 97 U.S. 120, 24 L.Ed. 935; United States v. Adams, 1965, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572; Sterner Lighting, Inc. v. Allied Electrical Supply, Inc., 5 Cir. 1970, 431 F.2d 539. It is uncontradicted that the H valve was required to, and did, function under heretofore unprecedented conditions at Oak Ridge. The Board wholly failed to consider the facts relating to the operation of the H valve and the possibility that the prior art, even assuming its basic similarity, could not operate successfully under the new conditions although the H valve clearly could.

Fourth, the statute requires obviousness "to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. Yet, there is a noticeable dearth of evidence in the record as to the ordinary skill of those proficient in the art at the time of the invention as against an abundance of evidence of the unsuccessful efforts of many highly skilled technicians in their attempts to fill the need which the H valve admittedly filled. The evidence points to the conclusion of non-obviousness not, as the Board concluded, to obviousness.

Finally, Graham v. John Deere Co., 1966, 383 U.S. 1, 86 S.Ct. 684, 15 L. Ed.2d 545, enumerates certain secondary considerations which may be relevant in assessing non-obviousness:

> Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or

nonobviousness, these inquiries may have relevancy.

383 U.S. at 18, 86 S.Ct. at 694. These considerations will not, without more, satisfy the § 103 non-obviousness requirement, but may be considered after the primary inquiries discussed above have been investigated. Anderson's-Black Rock v. Pavement Salvage Co., 1969, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed. 2d 258; Goodyear Tire & Rubber Co. v. Ray-O-Vac, 1944, 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721; Kardulas v. Florida Machine Products Co., 5 Cir. 1971, 438 F. 2d 1118; Waldon v. Alexander Mfg. Co., 5 Cir. 1970, 423 F.2d 91. Here we have evidence of the rapid acceptance of the H valve at Oak Ridge and its subsequent continued use in the Paducah and Portsmouth plants. Similarly, the record demonstrates the need for the H valve and the failure of others to develop it despite this pressing need. These factors serve to reinforce our conclusion that the H valve was non-obvious.

We hold, in view of the heavy burden incumbent upon one seeking to rebut the presumption of patent validity, that there was not substantial evidence in the record from which the Board could find the H valve patent invalid in view of prior art and deny compensation on that ground.

### IX. *The H Valve—The Sole Inventorship Defense*

In order for a patent to be valid, the patent applicant must be the sole inventor of the invention sought to be patented, and a patent on a joint invention which is issued to only one inventor is invalid. 35 U.S.C. § 102(f). *See* Pointer v. Six Wheel Corp., 9 Cir. 1949, 177 F.2d 153 and cases cited therein. It is clear, however, that an inventor may use the services, ideas, and aid of others in the process of perfecting his invention without losing his right to a patent. The law has long been settled:

> He is the inventor and is entitled to the patent who first brought the machine to perfection and made it capable of useful operation.

* * * * * *

No one is entitled to a patent for that which he did not invent unless he can show a legal title to the same from the inventor or by operation of law; but where a person has discovered an improved principle in a machine, manufacture, or composition of matter, and employs other persons to assist him in carrying out that principle, and they in the course of experiments arising from that employment, make valuable discoveries ancillary to the plan and preconceived design of the employer, such suggested improvements are in general to be regarded as the property of the party who discovered the original improved principle, and may be embodied in his patent as a part of his invention.

Suggestions from another, made during the progress of such experiments, in order that they may be sufficient to defeat a patent subsequently issued, must have embraced the plan of the improvement, and must have furnished such information to the person to whom the communication was made that it would have enabled an ordinary mechanic, without the exercise of any ingenuity and special skill on his part, to construct and put the improvement in successful operation.

Persons employed, as much as employers, are entitled to their own independent inventions, but where the employer has conceived the plan of an invention and is engaged in experiments to perfect it, no suggestions from an *employe,* not amounting to a new method or arrangement, which, in itself is a complete invention, is sufficient to deprive the employer of the exclusive property in the perfected improvement. But where the suggestions go to make up a complete and perfect machine, embracing the substance of all that is embodied in the patent subsequently issued to the party to whom the suggestions were made, the patent is invalid, because the real invention or discovery belonged to another.

Agawam Woolen Co. v. Jordan, 1869, 74 U.S. 583, 602–603, 19 L.Ed. 177, 181–182. See Union Paper Collar Co. v. Van Deusen, 1875, 90 U.S. 530, 23 L.Ed. 128.

■■■ Hobbs, of course, insists that he is the sole inventor of the H valve while the government asserts that the invention was developed by Crane employees or, at the very least, was the product of joint development by Hobbs and the Crane employees. The Board concluded that Hobbs "was not the sole inventor and that the patent is invalid for that reason." 165 U.S.P.Q. 137. In reaching this decision the Board appears to have erroneously transferred the burden on the issue of patent validity. The Board's discussion of the evidence indicates that it expected Hobbs to prove that he was the sole inventor of the H valve; under the statute, however, the presumption of patent validity requires the government to shoulder the burden of establishing invalidity by proving joint-invention. *See* Union Paper Collar Co. v. Van Deusen, 1875, 90 U.S. 530, 23 L.Ed. 128; Clow & Sons v. United States Pipe & Foundry Co., 5 Cir. 1963, 313 F.2d 46; International Carrier-Call & Television Corp. v. Radio Corp. of America, 2 Cir. 1944, 142 F.2d 493.

■■■ Bearing in mind the presumption and quantum of proof necessary to rebut it, we hold that there was not substantial evidence in the record from which the Board could reach its conclusion that Hobbs was not the sole inventor. Because the Board shifted the burden of proof, it does not even refer to any evidence which might be said to refute sole-inventorship. We have therefore once again been relegated to a detailed examination of a ponderous record in search of evidence upon which the Board might have relied. The only such evidence we can discover is a series of written communications from Crane to Kellex identifying aspects of Hobbs's design Crane considered impractical and suggesting modifications based on Crane's research and development efforts. These documents merely indicate

aid in the perfection of Hobbs's original design and are insufficient to establish the Crane employees as co-inventors in any sense of that term. On the other hand, the record contains substantial evidence indicating that Hobbs initially conceived the H valve, made extensive disclosures in writing of his conception of the H valve, and gave frequent detailed instructions as to the work which should be done by Crane employees in improving the initial conception and constructing a valve based on that conception. Admittedly Hobbs used, as he legitimately could, the services of Crane employees in the development of the H valve. Yet there is not substantial evidence in the record that Crane employees aided in that development to such a degree as to constitute them co-inventors under the *Agawam* test quoted above.

Still another consideration leads us to conclude that Hobbs was the sole inventor of the H valve. In its discussion of this issue, the Board stated, "In this instance it is unnecessary to identify any employee of Crane as the inventor or co-inventor in order to decide that Applicant was not the sole inventor of the subject matter of the claims of the patent * * *." 165 U.S.P.Q. 137. The Board in fact never identified any employee or group of employees as being responsible for the invention. In marked contrast to this treatment of the issue of sole inventorship of the H valve, as to the G valve the Board stated:

> The testimony of those who believed that employees of the Crane Co. first proposed that the wedge be extended and guided by means in the valve body, and that this improvement was not suggested by Hobbs, while reflecting the recollections of several who were as fully concerned as was Hobbs with the need to quickly produce a satisfactory gate valve, while entitled to full credit, *lacked definiteness in one important respect, i. e. in not establishing the identity of any certain person as the one who did suggest the improvement under discussion.* Under these circumstances the Board has

concluded that Respondent's proofs are insufficient to establish invalidity of the Hobbs gate valve patent on the ground asserted, i. e. that the patentee Hobbs was not the real inventor. (emphasis supplied)

165 U.S.P.Q. 137. We need not and do not decide the intriguing question whether to establish the sole-inventorship defense, the true inventor or co-inventor must be specifically identified. We merely note that the Board's failure to identify someone other than Hobbs or in addition to Hobbs as the inventor, while considering that identification crucial to the issue, reinforces our belief that substantial evidence does not exist in this record from which the Board could conclude that Hobbs was not the sole inventor. The sole-inventorship defense to patent validity is therefore ineffective to deny Hobbs just compensation for the H valve.

### X. *The H Valve—Infringement*

■ Having decided that Patent No. 2,617,621 on the H valve is valid and not subject to any of the defenses raised by the government, we must now determine if that patent is infringed so as to entitle Hobbs to compensation. *See* 60 Stat. 768 et seq. The infringing valves were furnished to the government by Crane, Fulton-Sylphon, and Hoke. Design I of the H valve Crane furnished is alleged to infringe claims 1 and 4 of the H valve patent; Design II Crane furnished is alleged to infringe claims 1 and 5. Fulton-Sylphon's Design II is alleged to infringe claims 1 and 5. Design III valves Fulton-Sylphon and Hoke furnished are alleged to infringe claims 6 and 7.

■ As with many issues in the field of patent law, the standards for assessing infringment have been settled since the 19th century:

> Except where form is of the essence of the invention, it has but little weight in the decision of such an issue, the correct rule being that, in determining the question of infringement, the court or jury, as the case may be, are not to judge about similarities or

differences by the names of things, but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result; always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions or in a different way or produce a substantially different result.

Machine Co. v. Murphy, 1878, 97 U.S. 120, 125, 24 L.Ed. 935, 936. See Graver Tank & Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097; Laitram Corp. v. Deepsouth Packing Co., 5 Cir. 1971, 443 F.2d 928; American Seating Co. v. Southeastern Metals Co., 5 Cir. 1969, 412 F.2d 756;

Stewart-Warner Corp. v. Lone Star Gas Co., 5 Cir. 1952, 195 F.2d 645. Patent construction is seldom a matter of pure literalism but involves inquiry into "means, operation, and result." Sterner Lighting, Inc. v. Allied Electrical Supply Inc., 5 Cir. 1970, 431 F.2d 539. See Laitram Corp. v. Deepsouth Packing Co., 5 Cir. 1971, 443 F.2d 928.

■ Because the Board ruled claims 1, 2, 3, 4, and 6 of the H valve patent invalid on several grounds, the Board never faced the issue of infringement of the patent as to those claims. The Board, because it did hold claims 5 and 7 valid as to the issue of prior art, reached the issue of infringement as to those claims and decided that they were not infringed. The Board gratuitously held that claim 6, previously held invalid, was not infringed. The Board's reasoning relied heavily on form rather than substance, basing non-infringement on a technical structural distinction.[14] Al-

---

14. Claims 5 and 7 are of somewhat different scope in that each includes a "bonnet" for limiting the movement of the flow regulating member toward open position. Insofar as the record discloses, this is a novel feature of such a valve and Claims 5 and 7, therefore, do describe new combinations of elements so that these claims are to be seriously considered from the standpoints of validity and infringement. The Crane valve of Ex. S–62 does not include either a "bonnet" or an equivalent but the Fulton-Sylphon and Hoke valves each includes such a member.

The Fulton-Sylphon drawing, Ex. S–64, is unclear but that valve does seem to include a "bonnet" and the claim is infringed if the valve means includes, in addition, an elastomeric gasket sealing substance and weight is given Applicant's argument to the effect that it describes valves in which the flow regulating member extends through an aperture in the bellows end. Those patents of the prior art available to the Board do not disclose a valve member movement limiting "bonnet" such as described in Claim 5. The Crane valves, Designs 1 and 2 include no such means although including an element designated a bellows retaining nut. This nut has no portion which engages the move-

able valve member in such fashion that the valve opening motion of that member is limited.

Claims 6 and 7 are said to cover the Hoke valve Ex. S–65. Claim 6 is broader in scope than Claim 7 which is limited, as was Claim 5, to include a "bonnet" for limiting the extent of the valve opening movement of the flow controlling member the bonnet being within the cap and without the bellows. This claim, as does Claim 5, describes a novel structure and is not limited to an elastomeric gasket as is Claim 5.

However, Claim 5 specifies that the bellows wall of increased thickness contacts both the valve member and "said rotatable member-moving means" (cap 29). In Design No. III, as shown by drawing Ex. S–64 (Fulton Sylphon), and drawing Ex. S–65 (Hoke), there is no corresponding structure, because the valve cap is in direct contact with the valve stem and does not contact the bellows.

Claims 6 and 7 recite that "said bellows having a thickened end wall overlying the end of said stem." In Design No. III, the end of the stem has a shoulder to which the bellows is secured, so that the "overlying" feature is absent.

though not reaching the issue of infringement of claims 1, 2, 3, and 4, the Board, in its "Findings of Fact" said,

94. The Crane "H" valves [which are changed to infringe claims 1 and 4] are the same in structure and have the same mode of operation and get the same results as the valve of Fig. 1 of the "H" valve patent.

\* \* \* \* \* \*

96. The Fulton Sylphon "H" valves, Design II, [which are changed to infringe claims 1 and 5] are the same in structure and have the same mode of operation and get the same results as the valves of Fig. 2 of the "H" valve patent.

\* \* \* \* \* \*

99. The structure of the Hoke, Inc. "H" valves, Design III [which is changed to infringe claims 6 and 7] is substantially the same as is shown in Fig. 2 of the patent as modified by the variation described in the last paragraph of column 6 of the patent, and has the same mode of operation and gets the same results as such valves.

165 U.S.P.Q. 112. These findings would of course establish a prima facie case of infringement under the Machine Co. v. Murphy test quoted above. In view of the confusing findings by the Board, we have once again gone directly to the record. We hold that there is substantial evidence in the record from which the Board could conclude, as it apparently did in Findings 94, 96, and 99, that the valves supplied to the government by Crane, Fulton-Sylphon, and Hoke infringed claims of the H valve patent.[15] The record shows that not only are the Crane, Fulton-Sylphon, and Hoke valves nearly identical in form but more importantly they also evidence the same means, operation, and result. The Crane valve was admittedly based upon Hobbs's design, on which the patent was granted, and the other valves were used interchangeably with the Crane valve.

## XI. The G and H Valves—Another Theory

◼ Hobbs advances a further statutory basis for relief in addition to §§ 11 (a) and (b) already considered. He urges a right to just compensation based on § 11(a) (3) of the Atomic Energy Act of 1946 which provides:

(3) Any person who has made or hereafter makes any invention or discovery useful in the production of fissionable material or in the utilization of fissionable material or atomic energy for a military weapon shall file with the Commission a report containing a complete description thereof, unless such invention or discovery is described in an application for a patent filed in the Patent Office by such person within the time required for the filing of such report. The report covering any such invention or discovery shall be filed on or before whichever of the following is the latest: (A) The sixtieth day after the date of enactment of this Act; (B) the sixtieth day after the completion of such invention or discovery; or (C) the sixtieth day after such person first discovers or first has reason to believe that such invention or discovery is useful in such production or utilization.

60 Stat. 768. Hobbs contends that this section provides a basis for compensation different from the previous sections. Basically, he believes that, even if a de-

---

The Board holds that Claims 5, 6 and 7 are not infringed by valve Design No. III.
165 U.S.P.Q. 129–130.

15. The Board's decision would seem to find infringement of claims 1 and 4 in Finding No. 94; claims 1 and 5 in Finding No. 96; and claims 6 and 7 in Finding No. 99. Yet, subsequent language holds claims 5, 6 and 7 not to be infringed. We avoid resolving this dilemma by going directly to the record and finding substantial evidence of infringement in the record.

fense such as unpatentability is accepted to deny compensation for the taking and use of his patents, § 11(a)(3) provides for compensation for the taking of his invention regardless of whether or not the patent on that invention is valid.

This case is not, as Hobbs contends, one of first impression. The same statutory construction was urged and rejected in N. V. Philips' Gloeilampenfabrieken v. Atomic Energy Commission, 1963, 114 U.S.App.D.C. 400, 316 F.2d 401. There the applicants claimed an award for the taking and use of inventions which had previously been patented but on which the patent had expired. They relied on § 11(a)(3) arguing that it provided a right to compensation for the invention independent of the provisions granting a right to compensation for the taking of the patent. The Court said:

> The language quoted is ambiguous and might be read to include inventions covered by expired patents. However, reference to the legislative history quite clearly demonstrates that such was not the Congressional intent. The Senate Report accompanying this bill states: "To assure the Commission of *access to new inventions* * * * the bill requires that such inventions be reported to the Commission and creates a Patent Compensation Board with authority to make awards to inventors." [21] (Emphasis added.) The

21. S.Rep.No.1211, 79th Cong., 2d Sess., p. 26. (footnote from original)

> House Report states: "To take the place of the incentives offered by the patent system, it is proposed that in the case of an invention *which has not already been patented* * * * [the inventor] may receive an 'award' for his invention."[22] (Emphasis added.)

22. H.R.Rep.No.2478, 79th Cong., 2d Sess., p. 17. The quotation in text is taken from the minority statement, but was not controversial. See also statement of Congressman Elston, 92 Cong. No. 9485–9486 (1946). (footnote from original)

> In order to qualify for an award, "the claimant must be unable to claim just compensation under § 11(a) because *he had* and has no patent covering his invention or discovery." (Emphasis added.) Fletcher v. United States Atomic Energy Com'n, 89 U.S.App. D.C. 218, 221, 192 F.2d 29, 33 (1951), cert. denied, 342 U.S. 914, 72 S.Ct. 361, 96 L.Ed. 684 (1952). Obviously, since the inventions claimed here *had* been the subject of patents, the Commission properly denied petitioners' claim for an award.

*Id.* at 410. We agree with the District of Columbia Circuit that § 11(a)(3) may not be used as a basis for compensation for inventions which have been patented.

## XII. *Just Compensation*

After almost fifteen years of litigation, Hobbs's right to just compensation has finally been established.[16] However, the amount of that compensation remains to be fixed. Hobbs has presented some proof to the Board on the issue of compensation, but the government has not done so. In this situation, in spite of our reluctance to remand this case a second time, we must remand it to the Board for a determination of the amount of compensation to which Hobbs is entitled. Because of the many years during which Hobbs has been denied the compensation which is rightly his, we trust that the Board will not render a decision that will provoke a third appeal.

In the interest of judicial economy we deal with several questions of the issue of compensation. § 11(e)(3), quoted above enumerates the standards the Board should take into account in determining just compensation. Included among the relevant factors is "the extent to which, if any, such patent was developed through federally financed research * * *" 60 Stat. 770. In its first decision the Board held that Hobbs's inventions "were developed completely through federally financed work,

16. The original claim for compensation was filed with the Board in October 1956.

whether it be called 'research' or some other name." To this assertion, this Court, on the first appeal, replied:

> The statute uses the word "research", not the word "work" or any other word. To us, "research" implies more than work. It involves the notion of lengthy, complex technical investigation. We conclude, therefore, that an invention developed in connection with a federal contract is not necessarily the product of "federally financed research" as that term is used in the Act. ¶ In this case, the invention of the two valves was not the product of an intensive investigation. Rather the idea came to Hobbs suddenly one night in a Chicago hotel room, and was reduced to practice quickly, without exhaustive experimentation, and at very little cost to the government. The Board should take these considerations into account when on remand it considers the "federally financed research" clause of section 11(a) (3).

Hobbs v. United States, 5 Cir. 1967, 376 F.2d 488, 496–497. On remand, the Board again concluded that Hobbs's invention was the product of "federally financed research" as it understood that term to be used in the statute.[17] We find no substantiation for that conclusion and hold, as a matter of law, that Hobbs's invention of the H valve was not the product, to any extent, of federally financed research. Any work which was done by Crane employees was not the type of "research" contemplated by the Act.[18] Those employees did aid in the development of the invention, as the Board found. However, what they did was only such work as is done in embodying an invention into a commercial device. Their work was not "research". Because the work done by Crane employees was not "federally financed research," the cost to the government of their work and materials may not be considered in assessing just compensation.

The government contends that Hobbs's compensation should be measured by a formula which he himself allegedly established. They point to a license to Crane for 5% of the net sale price as establishing "the value to him [the patentee] of the right or license to use appropriated by the Government." Olsson v. United States, 1938, 25 F.Supp. 495, 87 Ct.Cl. 642.[19] Although we ap-

---

17. 7. Any just compensation which the Applicant may be entitled to receive shall be determined by evaluating the Applicant's contribution and deducting therefrom the cost to the Government of materials used and work done by those other persons who were engaged in the effort which resulted in the development of the invention used by the Government for which use just compensation is sought.
165 U.S.P.Q. 145.

18. Footnote 8 to our earlier opinion stated:
Webster's Second New International Dictionary defines "Research" as: [C]ritical and exhaustive investigation or experimentation. * * * "

19. The rule to be applied in measuring the compensation depends upon the facts and circumstances of each case, but the end to be obtained in every case is always the same, namely, the determination and allowance of just compensation to the patentee for the value to him of the right or license to use appropriated by the Government. Richmond Screw Anchor Company v. United States, 275 U.S. 331, 48 S.Ct. 194, 72 L.Ed. 303. Berdan Fire-Arms Manufacturing Company v. United States, 26 Ct.Cl. 48, 82.
Olsson v. United States, 1938, 25 F.Supp. 495, 87 Ct.Cl. 642. Lest the Board, on remand, rely too heavily on the facts of Olsson rather than the standard, we point out several distinctions between that case and the case at bar. In Olsson the patent was not of general commercial value; here, the patent clearly is commercially valuable. In Olsson the chief value of the patent lay in the possibility of the

prove the Olsson standard upon which both parties apparently agree, we dispute the government's use of that standard in this way. The license granted to Crane by Hobbs upon which the government relies covered other valves. It was a nonexclusive license on pressure seal valves which contained an option to include patents on other inventions. There is no evidence that the option was ever exercised. According to Hobbs, the license also included an obligation on the part of Crane to pay Hobbs additional compensation for design and services. This license clearly does not establish a value for the H valve which is determinative of Hobbs's present right to just compensation.

Finally, we believe it is necessary to define the scope of inquiry to be exercised by the Board on remand. The Board's task is to assess "just compensation" for the taking and use by the government of Hobbs's H valve patent. Atomic Energy Act of 1946, §§ 11(a) and (b), 60 Stat. 768. In accomplishing this task, the Board should consider the standards enumerated in § 11(e) (3) of the Act. 60 Stat. 770. In doing so, it should remember: (1) We have held the patent valid against all infringement defenses raised below. (2) We have held that the patent was not developed, to any extent, through federally financed research.

The decision of the Atomic Energy Commission is reversed, and the case is remanded to the Patent Compensation Board for further proceedings consistent with this opinion. We again express our hope that the Board's calculation of just compensation will not generate a third appeal.

United States embodying it in a larger combination; here, Hobbs could have exploited the patent by itself and without embodiment by the government. In *Olsson* the inventor could not have had his invention manufactured and sold to the United States. In the case at bar, Hobbs might well have done so. In both cases, the government assumed the risk and expenses of manufacture. Yet, in *Olsson* unlike the present case, that was the only way in which the inventor could have commercially exploited his invention. In *Olsson* the government contributed to research and development by its embodiment of the invention in a larger combination. Here, the invention was invented by Hobbs, and the work by other government employees was not "research" to be considered in assessing compensation.