615 F.2d 222
 205 U.S.P.Q. 777
 HURON MACHINE PRODUCTS, INC., Plaintiff-Appellant,
v.
A. AND E. WARBERN, INC., formerly known as Warbern Packaging
Industries, Inc. and Warbern Packaging Industries,
Inc. of Florida, Inc., Defendants-Appellees.
 No. 78-1063.
 United States Court of Appeals,
Fifth Circuit.
 April 8, 1980.
 
 Barry L. Haley, Fort Lauderdale, Fla., for plaintiff-appellant.
 Blum, Moscovitz, Friedman & Kaplan, James K. Silberman, New York City, for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before TUTTLE, BROWN and TATE, Circuit Judges.
 TUTTLE, Circuit Judge:
 
 
 1
 We have here for consideration the validity of a patent which has expired during the course of this litigation. If valid, we then review the district court's finding of infringement.
 
 
 2
 The patent, No. 3,047,196 (Phillips and Levine), was issued on July 31, 1962. It expired on July 31, 1979. It covers a molded plastic clothes hanger. This hanger is inexpensive, selling for five cents at time of trial, yet it is designed to grip articles of clothing, generally skirts, firmly enough to be affixed at the factory to be left in place for shipping, to be used by the retailer, and to be passed on to the ultimate customer. The gripping mechanism consists of three plastic fingers at each end of the plastic holder (all cast in a single mold). These fingers are so formed and positioned that the line formed by the top of the garment is in a plane with the holder. The two outer fingers of each set of three are straight, but the middle finger is formed so that a part of it projects across the plane. Thus, a garment pulled up between the two outer and the inner finger tends to be held by friction. This tendency is greatly increased by the shape of the fingers. Each of them has a shoulder molded in at the lower end, so that a garment will naturally rest upon these shoulders, which, however, are sufficiently rounded so that the garment can be pulled off without effort. These shoulders are called "spoon shaped ends" in the patent.
 
 
 3
 The challenged (Huron) hanger is identical with the patented (Warbern) hanger with two exceptions: (1) the two outer fingers in the former are joined by a plastic loop which passes under, but is not connected with, the middle finger. In both structures, the middle finger is shorter than the two outer fingers. (2) The suit patent is constructed so that the outer fingers are placed on the opposite side from the middle finger, leaving the garment to hang in a plane with the hanger holder or web. The two fingers of the accused hanger are extended in the axial plane of the web, leaving the third finger to one side of the plane. The trial court found that this structure would cause the garment to hang slightly crooked, but would not otherwise have any significance.
 
 
 4
 The accused hanger was designed and made by the appellant, Huron, after acquiring a copy of the Phillips-Levine patent. Upon receiving notice that the owners of the patent, Warbern, claimed infringement, Huron filed a complaint for a declaratory judgment that the patent was invalid and not infringed. Warbern denied the material allegations of the complaint and counterclaimed for patent infringement, seeking an injunction and an accounting for damages.
 
 
 5
 The trial court made numerous findings of fact, many of which are not protected by the clearly erroneous standard of review, because they involve analysis and interpretation of the suit patent and other patents noted by the examiner and some not taken into consideration by him. However, there are some findings of fact that must stand, absent our determination that they were clearly erroneous. Among these, not even challenged by appellant, are the following:
 
 
 6
 (8) Huron and Warbern deal in, among other things, plastic garment hangers known in the trade as ship-on hangers. A ship-on hanger is one which is purchased by a garment manufacturer who hangs his garment on the hanger and ships it to his customer, usually the retail store, on the hanger. The retailer displays the garment for sale by hanging it from a display rack on the same hanger. When the garment is purchased by the consumer, it is usually delivered with the hanger still on it. From the time the hanger is applied by the garment manufacturer it is not removed until a consumer wants to try-on or wear the garment. Ship-on hangers are generally inexpensive. They may be reused by the consumer but are not designed or constructed to have an indefinite life.
 
 
 7
 (13) In the late 1950's and early 1960's the garment hanger industry was selling molded plastic garment hangers. The plastic hangers were functionally the same as the wooden and wire hangers which they replaced. Plastic ship-on hangers were used on a small scale for skirts, blouses and dresses.
 
 
 8
 (14) Garments with waistbands and no shoulders such as skirts, slacks, shorts, bathing trunks and like goods were not shipped on ship-on hangers at that time. Such garments were either folded and packed for shipment or were pinned onto wire hangers like those used today by dry cleaners or were pinned onto cardboard hangers and shipped to the retailers hung on the wire or cardboard hangers.
 
 
 9
 (15) The wire and cardboard hangers were neither suitable nor attractive for use by retailers to display their goods and it was necessary for each garment to be either unpacked or unpinned from the hanger and put on a permanent type hanger known as a store fixture hanger. These hangers were intended for reuse by the retailer and the wire or cardboard hangers were discarded.
 
 
 10
 (16) Substantial labor was required at the retail level to remove garments from temporary hangers and mount them on store fixture hangers and this also delayed the garments in their travel from receiving to the sales floor.
 
 
 11
 (17) The wire and cardboard hangers cost the garment manufacturers in the neighborhood of one cent each while the store fixture hangers cost the retailer ten cents and sometimes substantially more.
 
 
 12
 (24) The growth in sales of the patented hanger was remarkable. In the years 1962 and 1963 Warbern had only one style of patented hanger and sold about 300,000 units in each year. By 1964, the number of units sold of the single style had jumped to over one million. In 1965, a second style was added and close to three million units were sold.
 
 
 13
 (25) The patented hanger became a staple in the industry and continues to enjoy such status, over 15 years after it was first introduced. Substantially every brand name garment manufacturer uses the patented hanger manufactured by Warbern or a licensee of Warbern when it ships skirts, slacks, shorts and like goods on a hanger.
 
 
 14
 (26) Warbern now has about 10 styles of patented hangers in its line and in 1976 Warbern sold about 30 million units of the patented hanger. While records for several years are incomplete, since 1962 Warbern has sold over 250 million patented hangers.
 
 
 15
 (27) The success of the patented hanger was so unprecedented that copies abounded. Warbern took vigorous steps to prevent violation of its patent. In five actions in different jurisdictions judgments were entered by consent holding the patent valid and infringed. In one case, a cross license agreement was entered into. In another case an infringer paid a substantial sum for a paid up license. In two cases, the costly molds used for producing the infringing hangers were delivered to Warbern. In all other instances, including infringements that were resolved without resort to litigation, the infringements were discontinued.
 
 
 16
 The trial court carefully analyzed the state of the art by reference to patents cited to the examiner and to seven others not noted by him. The court found the patent was not obvious, that it was valid and infringed. The parties are not in disagreement over the principle that ordinarily a strong presumption of validity aids the patentee when his patent is attacked, or that this presumption is greatly weakened if prior art, more similar to the patent, was not submitted to the patent examiner. Cathodic Protections Service v. American Smelting and Refining Co., 594 F.2d 499 (5th Cir. 1979).
 
 
 17
 Huron's principal, and only substantial, ground of appeal is the contention that the Warbern patent is invalid as being obvious under 35 U.S.C. 103.[1] This argument is based on the claim that in light of the Bacica patent, No. 2,522,595, and the Caldwell patent, No. 2,209,318, it would be obvious for one of ordinary skill in the art to combine certain features of the two in order to arrive at the "identical structure" claimed in the Warbern patent. Huron cites Great A & P Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Graham v. John Deere Plow Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) and Anderson's Black Rod v. Pavement Salvage Co., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969) and Sakraida v. Ag. Pro., Inc., 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976) for the proposition that for a combination patent to be valid, which is one merely made up of old, known elements put together in a combination, there must be an unexpected, unusual or synergistic result. This principle is well known, but, as held by the trial court, it does not aid this alleged infringer. Here, the Bacica and Caldwell patents could not be combined to produce the patent in suit. Bacica was a metal frame with a clip on each end; each clip consisting of at least five parts, including two rivets. The clips could be operated by pressing the top against a spring to open the space for receipt of a garment. Caldwell was merely a single one-piece stamped metal "clip" which could open to receive a garment if squeezed by the operator. It was not shown in any way connected with a frame or web. As stated by the trial court: "The combination of Caldwell with Bacica would result in changing from one form of spring clip to another. To obtain the patented hanger substantial further modifications would be required." The court illustrated this by stating in its conclusions of law: "The patented hanger differs from the prior art in that it represented the first (and only) one piece, integrally formed, disposable, plastic garment hanger which could securely hold a garment with a waistband, such as a skirt, during packing, shipping, display and sale of the garment."
 
 
 18
 We agree with the trial court that "even with knowledge of the prior art in 1961, one skilled in the hanger art would not have created the patented hanger without the exercise of inventive skill."
 
 
 19
 The court fully recognized the principle that:
 
 
 20
 Under Sec. 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.
 
 
 21
 Graham v. John Deere Co., supra, 383 U.S. at 17, 86 S.Ct. at 694.
 
 
 22
 The court also adverted to its duty to consider commercial success of the patent as a secondary consideration affecting the issue of obviousness. This Court has said:
 
 
 23
 Finally, Graham v. John Deere Co., 1966, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, enumerates certain secondary considerations which may be relevant in assessing nonobviousness:
 
 
 24
 Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.
 
 
 25
 383 U.S. at 18, 86 S.Ct. at 694. These considerations will not, without more, satisfy the § 103 non-obviousness requirement, but may be considered after the primary inquiries discussed above have been investigated. Anderson's Black Rock v. Pavement Salvage Co., 1969, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258; Goodyear Tire & Rubber Co. v. Ray-O-Vac, 1944, 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721; Kardules v. Florida Machine Products Co., 5 Cir. 1971, 438 F.2d 1118; Waldon v. Alexander Mfg. Co., 5 Cir. 1970, 423 F.2d 91. Here we have evidence of the rapid acceptance of the H valve at Oak Ridge and its subsequent continued use in the Paducah and Portsmouth plants. Similarly, the record demonstrates the need for the H valve and the failure of others to develop it despite this pressing need. These factors serve to reinforce our conclusion that the H valve was non-obvious.
 
 
 26
 Hobbs v. United States Atomic Energy Commission, 451 F.2d 849, 864 (5th Cir. 1971).
 
 
 27
 We agree with the trial court that Huron failed to prove that the patent was obvious within the meaning of § 103.
 
 
 28
 There can be little argument but that the accused structure was an infringement. The connection of the two outer fingers of each clip by a plastic loop added nothing to the patented article. Each element of the infringing structure performed precisely the same function that this corresponding element performed in the suit patent.
 
 
 29
 Appellant has filed a motion pending this appeal that we remand this case to the trial court pending final determination of a suit on the same patent in the Southern District of New York, No. 74 C 1761. In that case, the Court, without discussion, found the suit patent invalid. That judgment was entered nine months after the judgment below. The Court of Appeals for the Second Circuit, no doubt considering the teachings of Blonder-Tongue, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)[2], stayed the appeal from the New York judgment until after this Court filed its decision here. The motion of appellant is therefore denied.
 
 
 30
 The judgment is AFFIRMED and the case is REMANDED to the trial court for further proceedings.
 
 
 
 [1]
 Section 103 states:
 Conditions for patentability: non-obvious subject matter
 A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.
 
 
 [2]
 That court might well have considered itself bound by a decision of this Court in this prior litigation if we had found the patent invalid. We find no case that concludes that Blonder-Tongue permits a defense of estoppel against a patentee in a suit in which the patent has been declared to be valid because of a later judgment of invalidity by a different court. See Jamesbury Corp. v. United States, No. 189-63, 520-71 (June 2, 1978) (unpublished order in the case at 518 F.2d 1384 (Ct.Cl.1975)); Kearney & Trecker Corp. v. Cincinnati Milacron, Inc., 403 F.Supp. 1040 (S.D.Ohio, 1974), aff'd 562 F.2d 365 (7th Cir. 1977)