WARBERN PACKAGING INDUSTRIES, INC.,
Plaintiff-Appellant-Cross-Appellee,

v.

CUT RATE PLASTIC HANGERS, INC.,
Defendant-Appellee-Cross-Appellant.

Nos. 177, 281, Dockets 78–7473, 78–7496.

United States Court of Appeals,
Second Circuit.

Argued Feb. 18, 1981.

Decided June 5, 1981.

Rehearing and Rehearing In Banc
Denied August 14, 1981.

James K. Silberman, Blum, Kaplan, Friedman, Silberman & Beran, New York City, for plaintiff-appellant-cross-appellee.

Jerome Bauer, Bauer & Amer, P. C., Mineola, N. Y., for defendant-appellee-cross-appellant.

Before VAN GRAAFEILAND and KEARSE, Circuit Judges, and STEWART, District Judge.[*]

STEWART, District Judge:

This is a patent infringement case in which plaintiff-appellant Warbern Packaging Industries, Inc. ("Warbern") seeks damages resulting from the alleged infringement of its now expired patent, No. 3,047,196 (the "Levine patent"), by defendant-appellee Cut Rate Plastic Hangers, Inc. ("Cut Rate"). Plaintiff-appellant appeals from a judgment of the District Court for the Eastern District of New York, Dooling, J., dismissing plaintiff's action on the ground that its patent was not infringed by Cut Rate and, in any case, the patent is invalid. Cut Rate cross appeals from the judgment of the District Court denying attorneys' fees under 35 U.S.C. § 285.

I.

Warbern, a manufacturer and seller of plastic garment hangers, is the owner of the patent in suit, which introduced the concept of "ship-on" hangers to the market. Prior to the development of this patent, garments that hung by the waistband were shipped largely on wire hangers and transferred to more expensive hangers in the store, thereby requiring significant expenditures on labor. Although one-piece plastic hangers existed prior to the patent in suit, they lacked the crucial functional element—an effective gripping mechanism. Plaintiff's patent introduced such a mechanism by employing three plastic fingers with spoon-shaped ends at each end of the hanger web that, when laterally offset, created a shoulder to hold garments securely. (See diagram, appendix 1). These hangers did retain garments throughout the marketing process, enabling the use of the same hanger from the point of origin to the point of sale.

Defendant-appellee Cut Rate manufactures and sells a ship-on hanger that performs the same function as the product set forth in the Levine patent. The Cut Rate hanger, "instead of having distinct fingers surrounding a middle finger at each end of the hanger, presents a U-shaped downward extension of the web of the hanger surrounding a laterally offset finger at each end .... [O]nly the middle finger at each end of the accused hanger is 'laterally offset'." *Warbern Packaging Industries, Inc. v. Cut Rate Plastic Hangers, Inc.*, No. 74–1761, slip op. at 34 (E.D.N.Y. July 25, 1978). (See diagrams, appendices 2 and 3).

The circumstances leading up to the instant litigation are as follows. The inventors of the Levine patent, Bernard B. Levine and Robert Phillips, first obtained a design patent which issued on July 4, 1961.[1] (See diagram, appendix 4). The design patent introduced a unitary plastic hanger, but did not include a functional gripping mechanism. It proved to be ineffective for securely holding garments with waistbands and was never marketed.

About four months after obtaining the design patent, Levine and Philips filed an application for the Levine patent, which issued on July 31, 1962. The patent contained six claims, four of which are the subject of this litigation.[2] The patented

---

[*] Hon. Charles E. Stewart, Jr. of the Southern District of New York, sitting by designation.

[1] A design patent has been defined to include an article that is ornamental, a product of aesthetic skill and artistic conception. *Hygienic Specialties Co. v. H. G. Salzman Inc.*, 302 F.2d 614, 618 (2d Cir. 1962).

[2] Plaintiff has stipulated that claims 2 and 5 are not infringed by defendant, and no claim will be made in this action for the infringement of these claims.
The claims that remain in issue are:
1. An integrally formed garment hanger formed of a molded resilient thermoplastic

hanger was developed and marketed in 1962.

[F]or a considerable time sales, while not unimpressive, did not reach the scale which they later attained. However, after a sale was made to the manufacturer of a popular and good quality brand named line of clothing, the sales began to increase very rapidly and by the end of 1977, the evidence indicates, between 225 and 250 million of the hangers had been sold. Warbern was not without competition for the ship-on hanger market, but the evidence indicates that the hanger of the patent has established a clear dominance in the market for ship-on hangers for garments which can be hung by the waistband.

Slip op., *supra*, at 12.

Not unpredictably, other hanger manufacturers began selling products similar to the Levine patent. Since 1965, plaintiff has prosecuted alleged infringers of the Levine patent. Six cases involving claims of infringement of plaintiff-appellant's patent resulted in consent judgments, most of which included an admission by the accused company that the Levine patent was valid and infringed by the accused hanger.[3] Only one case involving the Levine patent, other than the instant case, was actually litigated. In an action against Huron Machine Products, Inc., which manufactured a product similar to the Cut Rate hanger, a permanent injunction was entered declaring the Levine patent to be valid and finding that Huron Machine Products infringed the patent by manufacturing and selling a hanger like the Cut Rate hanger, with the

comprising a horizontally extending web, a hook connected to the web intermediate the ends thereof, and a series of depending fingers connected to each end of said web, said series of depending fingers including longitudinally spaced apart inner, outer and middle fingers, each of said fingers being laterally offset with respect to the central axial plane of said web, and each of said fingers having a spoonshaped end whereby the spoonshaped end of adjacent fingers face and extend across said axial plane so that a garment slipped up between said fingers is frictionally retained therebetween.

3. A garment hanger integrally formed from a thermoplastic material comprising a transversely extending web, a hanger means connected to said web adaptable for suspending said garment hanger from a support, and means depending from said web for frictionally retaining a garment to said hanger, said means including a two point support for said garment, each point of support including at least a pair of depending fingers, each finger being laterally offset so as to extend to opposite sides of an axial plane of said hanger, said fingers having spoonshaped ends, said spoonshaped ends having opposed face portions projecting laterally of their respective fingers to define a shoulder spaced below the offset connection of said fingers to said web, and the faces of said spoonshaped ends extending across the axial plane of said hanger.

4. The invention as defined in claim 3 wherein one of said fingers is longer than the other, and the opposed curvature to define therebetween a path which facilitates the insertion of a garment therebetween.

6. An integrally formed garment hanger formed of a molded resilient thermoplastic material comprising a transversely extending web, a hanger having a hook end and a base end connected to said web midway between the ends thereof, a series of three spaced apart resilient fingers connected to each end of said web, each series of fingers including an outer, middle and inner finger, said inner and outer fingers being laterally offset to one side of the axial plane of said web, and said middle finger being laterally offset to the other side of said axial plane, each of said fingers having an intermediate portion and a spoonshaped tip end, and said spoonshaped tip end of each finger having a contoured face portion extending across the axial plane of said web so that a garment slipped between said fingers is frictionally retained therebetween, and one of said fingers of each series being longer than the other finger of said series, and the opposed face portions of said spoonshaped tip ends having convex curvatures to define therebetween a path which facilitates the insertion of a garment therebetween.

3. Plaintiff argued in the district court that the consent judgment entered on February 3, 1970 against Yankee Plastics Inc. is binding as res judicata as to defendant-appellee because its president, Jack Zuckerman, developed the Yankee hanger that was enjoined by the judgment, and was an officer of Yankee Plastics. The district court found and appellant does not seriously dispute that Zuckerman is not bound because he was not an employee at the time the judgment against Yankee Plastics was entered.

U-shaped loop. This decision was affirmed in *Huron Machine Products, Inc. v. A. & E. Warbern, Inc.*, 615 F.2d 222 (5th Cir. 1980).

II.

The court below found that the Levine patent was not infringed by the Cut Rate hanger, and that the Levine patent is invalid. This holding was based substantially on the court's consideration of the significance of the design patent in determining the obviousness of the Levine patent. After discussing the history of the design patent and the subsequent development of the patent in suit, the court held that the design patent was prior art to be considered in determining obviousness. Plaintiff urged that the reasoning in *Illinois Tool Works, Inc. v. Solo Cup Co.*, 461 F.2d 265 (7th Cir.), *cert. denied*, 407 U.S. 916, 92 S.Ct. 2441, 32 L.Ed.2d 691 (1972) should be applied. There, the Seventh Circuit relied on 35 U.S.C. § 102(b) to hold that, where one's own invention is disclosed to the public within one year of a subsequent invention, one's own prior invention does not bar the subsequent patent.

The district court in the instant case rejected the reasoning of *Solo Cup* because, in its view, "if each of the patents was not patentable over the other (though one may have dominated the other) the patentee was obtaining a monopoly for longer than the patentable period." Slip op. at 22. The court instead adopted the reasoning of an older line of cases which held in effect that "[t]o support a separate patent, an improvement must meet all of the statutory requirements of patentability." *Application of Jaeger*, 241 F.2d 723, 726 (C.C.P.A.1957). In other cases, courts analyzed the problem in terms of the prohibition against double patenting, which the district court here defined to include obtaining a second patent claiming an invention which differs from an already patented invention only in some unpatentable particular. *Application of Ornitz*, 347 F.2d 586 (C.C.P.A.1965). The only limit on double patenting which the district court here was willing to recognize was that set forth in *Turzillo v. P & Z Mergen-*

*time*, 532 F.2d 1393 (D.C.Cir.), *cert. denied*, 429 U.S. 897, 97 S.Ct. 260, 50 L.Ed.2d 181 (1976), which held that the later patent need not show an inventive advance over what was disclosed but not claimed in the earlier patent.

The court then went on to hold that:

The three figures of the [design] patent clearly reveal the mechanical means by which the device is to function. The ornamental design expresses completely the function of the device. It therefore not only claims against all the world the ornamental design which it displays but discloses and publishes to all the world the hanger function and means expressed in the design.

Slip op., *supra*, at 30–31.

Although not specifying the scope of the prior art, the court included in its discussion of prior art patents of hangers, clothespins and clipping devices, and found that:

The prior art did not show any adequate retaining means that were wholly integral with a hanger but it was certainly alive with hints and suggestions pointing to the solution that the patentees chose.... The significance of the hanger art is not that it, unaided, suggests the device of the patent, but that, addressed to workers who had already come the distance represented by their design patent and who were seeking gripping means, these gripping means used in the hanger art were suggestive of ready adaptation to the patentees' integrally formed hanger.

Slip op., *supra*, at 53–54. Thus, the court held that, viewed against the prior art, the Levine patent was not sufficiently distinct from the hanger of the design patent to avoid the claim of obviousness. Although the court recognized the "commercial success and acquiescence in the patent in the face of vigorous enforcement," it concluded that "the subject matter as a whole would have been obvious at the time of the invention to a person having ordinary skill in the art to which the hanger belongs."

With respect to infringement, the district court found that:

Despite the differences in construction of the spoonshaped elements in defendant's accused hangers the elements are those of the patent claims; the tip ends of the fingers of the accused hanger are in the functionally significant respect spoonshaped; they form a holding shoulder, and the opposed faces of the ends define an inverted V guide for the insertion of a garment between the "fingers", utilizing the spoonshaped contours of the "ends" to facilitate the insertion of the garment.

Slip op., *supra*, at 44–45. Nevertheless, the court held that the defendant's hanger does not infringe the Levine patent because it does not have all three fingers laterally offset to an axial plane of the web. The court also held that the offsetting of fingers to opposite sides of the hanger to be so critical that it does not admit of substitution of a functional equivalent. On this basis, the court rejected the application of the doctrine of equivalence and held that plaintiff's patent was not infringed.

For the reasons set forth below, we hold that the Levine patent was valid and infringed by the Cut Rate hanger and the judgment of the district court must be reversed.

### III.

*The Validity of the Patent*

■ The district court found that Warbern's patent is invalid because it is obvious in light of the prior art, under 35 U.S.C. § 103. Section 103 provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

As the Supreme Court held in *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–694, 15 L.Ed.2d 584 (1966):

[T]he scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

A patent is presumed valid, and the burden of establishing invalidity of a patent rests on the party asserting its invalidity. 35 U.S.C. § 282 (1976).

We must first consider the scope and content of the prior art. The district court relied heavily on the design patent to support its conclusion of obviousness, and appellees echo this reliance in distinguishing the instant case from *Huron Machine Products, Inc. v. A. & E. Warbern, Inc., supra.* The parties vigorously dispute the standard to be applied in determining whether and to what extent an earlier patent is to be considered as prior art in determining the validity of a later patent filed by the same inventor within a year of the earlier patent. We have concluded that appellants' patent is not obvious under either of the approaches urged by the parties. Therefore, it is not necessary to reach the issue of the extent to which the design patent must be considered as prior art in determining the validity of the Levine patent.

As we discussed earlier, the prior art considered at trial consisted of patents on clothespins, clips and hangers. With respect to the state of the hanger art prior to the design patent and the Levine patent, the prior art consisted of wire, wood or plastic hangers with a separate gripping

device consisting of a clip with springs or a clamp that employs the concept of tension. Scurrah, No. 2,408,344 consisted of a clothes hanger the horizontal bottom of which provided a series of four lugs, separately mounted on the hanger which employed pins and springs to provide the gripping means. Bacica, No. 2,522,595, granted over Scurrah, and Colwell, No. 2,401,413, employ hanger clips at each end of the frame which also rely on springs to provide the gripping means. Anderson, No. 2,466,195 and Fortner, No. 2,633,277, present clamps to provide tension necessary to retain a garment.

With respect to the clothespin art, the patents included as prior art consist of clamps or finger devices that employ primarily tension produced by insertion of the clothesline as the gripping means. Ryan, No. 1,654,756, Caldwell, No. 2,209,318, Becker, No. 2,600,091, and Atkins, No. 2,452,175, are attached over both the garment and the clothesline, so that the clothesline as well as the clip is employed to suspend the garment. Witt, No. 1,314,998, employs a spring arm as a gripping device; Romano, No. 2,215,336, has a wire clamping means mounted on the hanger. Graham, No. 1,252,262, shows wire clamps with traverse inward hands forming gripping jaws that are opened by the insertion of the clothesline.

Neither party seriously disputes that uniting a holding device to a hanger was well-established in the art. However, we find nothing in the prior art that discloses an effective gripping device that could be incorporated into a unitary plastic hanger that could be used as a ship-on hanger. The design patent, des. 190,843, does not disclose any significant advance in a gripping mechanism, but rather makes use solely of a gripping mechanism based on the resiliency of the material. Although the design patent discloses the concept of a unitary plastic garment hanger, it does not introduce any new functional mechanism to retain garments securely. In fact, the design patent's apparent incorporation into the integrated structure of the gripping mechanisms disclosed in the prior art failed to achieve an effective gripping mechanism.

The district court found that the design patent displayed the goal of achieving an adequate retaining means that was wholly integral to the hanger, and then concluded in effect that this intention disclosed the most significant element of the patent. In our view, the gap between the goal of an effective gripping mechanism and the actual functioning of the design patent warrants the opposite conclusion. It provides further indication of the failure of past attempts to develop an effective gripping mechanism—the most important functional element of the Levine patent—and supports our conclusion that the creation of the Levine patent required the exercise of inventive skill.

The district court also appears to have held appellant to a higher standard of nonobviousness because of its involvement with the design patent. Slip op. at 53–54. The determination that the design patent required skill to invent does not affect our judgment of the degree of skill necessary to develop the gripping mechanism in the Levine patent.

The evidence establishes that the Levine patent introduced a significant advance in the art of hangers and clipping devices. The hanger simultaneously employed longitudinally spaced fingers that were laterally offset by the garment (rather than an independent supporting line) so as to extend to opposite sides of an axial plane with spoon-shaped ends that overlapped and shoulders at ends of the fingers. The gripping mechanism of the hanger did not rely solely on tension to retain the garments, but introduced the shoulders and the overlapping fingers to perform this function. Neither of these devices is suggested in the prior art. As the district court noted in *Huron Machine Products, Inc. v. A. & E. Warbern, Inc., supra,* the Warbern patent "represented the first (and only) one piece, integrally formed, disposable, plastic garment hanger which could securely hold a garment with a waistband, such as a skirt, during packing,

shipping, display and sale of the garment." 615 F.2d at 225.

Consideration of secondary factors provides further support for our conclusion that the patent was non-obvious. The record clearly establishes and the district court found that "[t]he secondary factors, commercial success and acquiescence in the patent in the face of vigorous enforcement have been amply made out. The evidence indicates that the need for such an article antedated the invention of the hanger in suit," slip op. at 51–52. Prior to the introduction of the patented hanger, in shipping the goods, it was necessary to use wire hangers to which garments were pinned. The ship-on hanger introduced a significant savings in time, labor and expense. The record shows that sales of the patented hanger grew from about 30,000 units in 1962 to about 30 million units in 1976.

We conclude that defendant-appellee failed to demonstrate that the Levine patent was obvious, and find that the district court's decision invalidating the patent is clearly erroneous.

*Infringement*

■■■ We must, then, determine whether the Cut Rate hanger infringes the Levine patent. Infringement is determined by reference to claims construed in light of the specification and drawings with a view to ascertaining the invention. *United States v. Adams*, 383 U.S. 39, 48–49, 86 S.Ct. 708, 712–713, 15 L.Ed.2d 572 (1966). Under the doctrine of equivalents, there is infringement if the allegedly infringing device "performs substantially the same function in substantially the same way to obtain the same result" as the challenging device. *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) (on rehearing).

We conclude that the Cut Rate hanger did infringe plaintiff's patent. The record provides substantial support for the district court's findings that the U-shaped extension between the outer fingers at the end of the Cut Rate hanger did not "obliterate the existence of the functional fingers." Slip op., *supra*, at 42. The district court properly found that the two hangers were similar with respect to the longitudinally spaced fingers, the spoonshaped tip ends, the holding shoulder and the opposed faces of the ends. *See* slip op., *supra*, at 44–45. Thus, the Cut Rate hanger incorporates all of the operatively significant elements of the patent in suit: the spoonshaped tips, the extension of the spoonshaped tips across the line where the garment is inserted, thereby forming shoulders, and the supporting shoulders. The patent in suit is thereby infringed.

The district court concluded to the contrary, despite its factual findings, and held that the Cut Rate hanger does not infringe plaintiff's patent because it does not have all three fingers laterally offset from an axial plane of the web. "Spoonshaped protuberances formed on the web itself simply are not formed on fingers laterally offset from the web." Slip op., *supra*, at 38. The trial court concluded that the offsetting of fingers to opposite sides of the hanger to be so critical that it does not admit of substitution of a functional equivalent.

The district court's emphasis on the locus of the axial plane and the mobility of the fingers in our view was misplaced. First, the language of the patent claims does not necessarily give rise to the interpretation adopted by the trial court. The trial court, noting that an axial plane need not be located within the web, focused on the language in all claims but claim 3 that the fingers be laterally offset from the central axial plane of the web or "the axial plane of the web." The court inferred from this language that "[t]hroughout the insistence is upon fingers that are laterally offset oppositely to each other and to the web or [sic] the hanger." *Id.* at 48.

This inference is not warranted either by the language of each of the claims or by the doctrine of functional equivalents. The language of claim 3 which refers to "an axial plane," is somewhat ambiguous, and at the very least is not inconsistent with a less restrictive interpretation of the locus of

the axial plane. The language could be interpreted to require only that the fingers be displaced from the central line, not necessarily that each finger move. Moreover, plaintiff's specification includes a directive that "the invention is not to be taken as limited to all of the details thereof as modifications and variations thereof may be made without departing from the spirit or scope of the invention." This language supports appellant's arguments that, by locating the axial plane within the web, they were merely disclosing the best method of implementing their invention, which is all they are required to do under 35 U.S.C. § 112. It is not disputed that the locus of the axial plane has no functional significance other than determining whether the garment will hang straight. By providing for displacement of the fingers around a central axial plane, a garment on the Levine hanger does hang straight, while on the Cut Rate hanger it hangs out of plumb.

This leads us to consider the functional significance, if any, of the locus of the axial plane, so that we can determine whether the two hangers "do the same work in substantially the same way, and accomplish the same result." *Graver Tank & Mfg. Co. v. Linde Air Products Co., supra*, 339 U.S. at 608, 70 S.Ct. at 856. As the trial court correctly stated, this involves a search for a definition of what the discovery of the patentee really was.

The "axial plane" is an imaginary plane located at the effective center line of function. It is, in effect, a concept to aid in understanding the mechanics of the gripping device. Its functional significance is not dependent on whether all the fingers move to either side of it, or whether it is located centrally. Rather, its importance is that, because of the spoonshaped tips, each finger extends *across* the axial plane, the effective center line of function, thereby providing an effective means of support. This element is clearly present in the Cut Rate hanger.

Therefore, the district court placed undue emphasis on the locus of the axial plane, and failed to recognize the significance of the gripping device introduced by the Levine patent. We hold as did the Fifth Circuit in *Huron Machine Products, Inc. v. A. & E. Warbern, Inc., supra*, that the accused hanger infringed the Levine patent.

IV.

*Cross-Appeal*

Defendant-cross-appellant appeals the decision of the district court denying defendant's request for attorneys' fees pursuant to 35 U.S.C. § 285 on the ground that this is an "exceptional case." The judgment denying attorney's fees is affirmed in light of our decision reversing the judgment in defendant's favor.

Having found that plaintiff-appellant's patent is valid and infringed, we reverse the judgment and remand the case to the trial court for further proceedings on the issue of damages.

APPENDIX 1

FIG. 1

FIG. 4

FIG. 3

FIG. 2

INVENTORS
Bernard B. Levine
Robert Phillips
BY Irving Deidman
ATTORNEY

## APPENDIX 2

FIG. A

## APPENDIX 3

FIG. B

AN AXIAL PLANE

APPENDIX 4

Fig. 1.

Fig. 2.

Fig. 3.

FIG. 1 is an elevational view of one side of a hanger for a skirt, or the like, showing our new design:

FIG. 2 is a end elevational view thereof: and

FIG. 3 is an elevational view taken from the side opposite that shown in FIG. 1.

We claim:

The ornamental design for a hanger for a skirt, or the like, substantially as shown.

References Cited in the file of this patent

UNITED STATES PATENTS

D. 146.261 Mack _____ Jan. 21, 1947
648.534 Seger _____ May 1, 1900
2.515.544 Artley _____ July 18, 1950